1  DAVID L. NEALE (SBN 141225)
   TANIA M. MOYRON (SBN 235736)
2  LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.
   10250 Constellation Boulevard, Suite 1700
3  Los Angeles, California 90067
   Telephone: (310) 229-1234
4  Facsimile: (310) 229-1244
   E-mails: DLN@LNBRB.COM; TMM@LNBRB.COM
5
6  Attorneys for CirTran Corporation

7              UNITED STATES BANKRUPTCY COURT
               CENTRAL DISTRICT OF CALIFORNIA
8                 SAN FERNANDO DIVISION

9  In re                        )  Case No. 1:06-10076-GM
                                )
10 ADVANCED BEAUTY SOLUTIONS,    )  Chapter 11
   LLC, a California limited     )
11 liability company,           )  ADV. NO. 1:08-ap-01363-GM
                                )
12                              )  **NOTICE OF MOTION AND MOTION TO**
13            Debtor.           )  **SET  ASIDE  DEFAULT  JUDGMENT;**
   _____)  **MEMORANDUM   OF   POINTS   AND**
14 ADVANCED BEAUTY SOLUTIONS,    )  **AUTHORITIES;   DECLARATION   OF**
   LLC, a California limited     )  **IEHAB  J.  HAWATMEH  IN  SUPPORT**
15 liability company,           )  **THEREOF**
                                )
16            Plaintiff,        )  Hearing:
                                )
17 v.                           )
                                )  Date:  [To Be Scheduled]
18 CIRTRAN CORPORATION, a Nevada )  Time:  [To Be Scheduled]
   Corporation,                 )  Place: Courtroom "303"
19                              )         21041 Burbank Blvd.
                                )         Woodland Hills, CA
20            Defendant.        )
   _____)
21

22      TO THE HONORABLE GERALDINE MUND, UNITED STATES BANKRUPTCY

23 JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE, PLAINTIFF AND

24 ITS COUNSEL OF RECORD:

25
        **PLEASE TAKE NOTICE** that a hearing will be held on [    ],
26
27 2009, at [   ] .m., before the Honorable Geraldine Mund, United

28

1 States Bankruptcy Judge, in Courtroom "303" located at 21041
2 Burbank Blvd., Woodland Hills, California, for the Court to
3 consider the motion (the "Motion") filed by CirTran Corporation
4 ("CirTran"), the defendant in the above-referenced adversary
5 proceeding (the "Action"), for the entry of an order setting
6 aside the default judgment (the "Default Judgment") entered in
7 the Action against CirTran.

8
9 **PLEASE TAKE FURTHER NOTICE** that the Motion is brought
10 pursuant Federal Rule of Bankruptcy Procedure 7055, Federal Rule
11 of Civil Procedure 55(c), Federal Rule of Civil Procedure 60(b),
12 and is based upon this Motion, the annexed memorandum of points
13 and authorities and the declaration of Iehab J. Hawatmeh filed
14 in support thereof, the entire record of this Action and related
15 bankruptcy case, the statements, arguments and representations
16 of counsel to be made at the hearing on the Motion, and any
17 other evidence properly presented to the Court at, or prior to,
18 the hearing on the Motion.

19 **PLEASE TAKE FURTHER NOTICE** that Local Bankruptcy Rule 9013-
20 1(f) requires that any opposition to the Motion be filed with
21 the Clerk of the Court and served upon counsel for CirTran at
22 the address set forth in the upper left-hand corner of the first
23 page hereof not later than fourteen (14) days prior to the
24 hearing date.
25

26 **PLEASE TAKE FURTHER NOTICE** that, pursuant to Local
27 Bankruptcy Rule 9013-1(h), the Court may deem the failure of a

28
2

1  party in interest to file a timely response to the Motion to

2  constitute consent to the granting by the Court of the relief

3  requested by CirTran.

4      **WHEREFORE**, CirTran respectfully requests that the Court

5  enter an order: (i) granting the Motion in its entirety; (ii)

6  setting aside the Default Judgment; and (iii) granting such

7  other and further relief as is just and proper under the

8  circumstances.

9

10 DATED: July 20, 2009                    CIRTRAN CORPORATION

11

12                                 By:_____

                                       DAVID L. NEALE
13                                     TANIA M. MOYRON
                                       LEVENE, NEALE, BENDER,
14                                         RANKIN& BRILL L.L.P.
                                       Attorneys for
15                                     CirTran Corporation

16

17

18

19

20

21

22

23

24

25

26

27

28
                                 3

1

**MEMORANDUM OF POINTS AND AUTHORITIES**

2

**I. STATEMENT OF FACTS**

3

4

5

**A.   CIRTRAN CORPORATION'S PURCHASE OF SUBSTANTIALLY ALL OF THE ASSETS OF ADVANCED BEAUTY SOLUTIONS, LLC IN THE BANKRUPTCY CASE.**

6

7

8

9

1.   Advanced Beauty Solutions, LLC ("ABS"), a California limited liability company, filed a voluntary petition for relief under chapter 11 of title 11, United States Code (the "Bankruptcy Code"), on January 24, 2006 (the "Petition Date").

10

11

12

13

14

15

16

17

18

19

20

21

2.   On January 24, 2006, ABS filed a motion to establish the bidding procedures (the "Bidding Procedures Motion") for the sale of substantially all of the assets of ABS's estate. Thereafter, on February 3, 2006, ABS filed a motion (the "Sale Motion") for the entry of an order, pursuant to sections 105, 363, 365 and 1146 of the Bankruptcy Code, authorizing and approving the following: (1) the sale and assignment of substantially all of the assets of the estate free and clear of liens subject to Court approved bidding procedures; (2) the assumption and assignment of certain leases and executory contracts; and (3) granting related relief.

22

23

24

25

26

3.   The Court approved the Bidding Procedures Motion on February 24, 2006. After various parties filed oppositions to the Sale Motion, ABS filed a supplemental sale motion and, after several continued hearings, the Court ultimately entered an order (the "Order") granting the Sale Motion.

27

28

4

1     4.   The Order, among other things, approved the purchase

2  agreement (the "Purchase Agreement") between ABS and CirTran

3  Corporation ("CirTran"). Attached as Exhibit "A" to the

4  declaration of Iehab J. Hawatmeh annexed hereto (the "Hawatmeh

5  Declaration") is a true and correct copy of the Purchase

6  Agreement. Pursuant to Section 2.4 of the Purchase Agreement,

7  CirTran purchased substantially all of ABS's assets for the

8  following consideration:

9

10          (a)   The aggregate consideration for the
            Assets (the "Purchase Price") shall be the
11          following: (i) a cash payment in the amount
            of $1,125,000, (ii) reduction of Purchaser's
12          $2,350,000 allowed general unsecured claim
            in the Bankruptcy Case by $750,000, leaving
13          Purchaser with an allowed general unsecured
            claim in the amount of $1,600,000 [the
14          "Allowed Claim"], (iii) the assumption of
            the Assumed Liabilities; and (iv) obligation
15          to pay Seller $3.00 per True Ceramic Pro
            flat iron unit (a "Unit") sold by Purchaser
16          in accordance with Section 2.4(b) and
            pursuant to the Settlement Agreement, the
17          Global Settlement, and the Settlement Order
            (the "Profit Share Obligation").
18

19  Purchase Agreement, ¶ 2.4(a), p. 10.

20     5.   Section 2.4(b) of the Purchase Agreement provides that

21  CirTran's obligation to pay ABS the Profit Share Obligation

22  shall be capped at $4,135,000. See Purchase Agreement, p. 10

23  ¶ 2.4.   This section further provides that to the extent the

24  amounts paid to ABS on account of the Profit Share Obligation

25  equal less than $435,000 on the second year anniversary of the

26  closing, then, within 30 days of such anniversary, CirTran shall

27  pay ABS an amount equal to $435,000 less the payments made to

28
                                    5

1    date (the "Anniversary Payment"). See Purchase Agreement,

2    ¶ 2.4(b), p. 10.

3    6.   Section 2.4 (c) of the Purchase Agreement provides

4    that CirTran shall provide an accounting of all sales used to

5    calculate the Profit Share Obligation. See Purchase Agreement,

6    ¶ 2.4(c), p.10.

7    7.   Section 9.12 provides that the remedy available for

8    any breach under the Purchase Agreement is specific performance

9    (the "Specific Performance Provision"). Specifically, the

10   Specific Performance Provision provides:

11

12        Specific Performance.   Notwithstanding
          anything to the contrary contained herein,
13        each party hereto acknowledges that money
          damages would be incalculable and an
14        insufficient remedy for any breach of this
          Agreement by such party and that any such
15        breach would cause the other party hereto
          irreparable harm.   Accordingly, each party
16        hereto also agrees that, in the event of any
          breach or threatened breach of the
17        provisions of this Agreement by such party,
          the other party hereto shall be entitled to
18        equitable relief without the requirement of
          posting a bond or other security, including
19        in the form of injunctions and orders for
          specific performance.
20

21   Purchase Agreement, p. 28, ¶ 9.12.

22   8.   On or before June 20, 2006, CirTran made a cash

23   payment to ABS in the amount of $1,125,000 as contemplated by

24   the Purchase Agreement.

25

26

27

28
                                   6

1   9.   As of March 28, 2008, CirTran paid ABS the total sum
2   of   $315,096.00,   which   represented   the   majority   of   the
3   Anniversary Payment as part of the Profit Share Obligation.

4   **B.   THE ADVERSARY PROCEEDINGS AND THE DEFAULT JUDGMENT.**

5   10.   On March 9, 2007, ABS filed a "Complaint for (1)
6   Breach of Contract; (2) Account Stated; (3) Unjust Enrichment;
7   (4) Accounting and (5) Receivership" (the "First Complaint")
8
9   against CirTran.   In the First Complaint, ABS asserted that
10  CirTran defaulted under the terms of the Purchase Agreement
11  because it failed to pay the oustanding Profit Share Obligations
12  and failed to provide an accurate accounting.

13  11.   Shortly thereafter, the parties reached a settlement
14  agreement that resulted in, among other things, the dismissal of
15  the First Complaint and the related adversary proceeding.

16  12.   On May 29, 2008, ABS commenced a second adversary
17  proceeding by filing a complaint (the "Second Complaint")
18  against CirTran which contained allegations that mirrored the
19  First Complaint.   As set forth in the accompanying Hawatmeh
20  Declaration, CirTran did not receive the Second Complaint and,
21  as a consequence, did not file an answer to the Second
22  Complaint.
23

24  13.   On February 24, 2009, ABS filed a motion for a default
25  judgment (the "DJ Motion") to be entered against CirTran.   The
26  DJ Motion requested a judgment in the amount of $1,808,233.00,
27  plus post judgment interest and $3,444.45, comprised primarily

28
7

1  of the following: (1) $129,633.00 of the Anniversary Payment
2  that was outstanding; (2) $1,669,958 purportedly outstanding as
3  part of the Profit Share Obligations based on an expert report
4  (the "Expert Report") prepared by Richard Nelson; and (3) costs.

5      14.  In the Expert Report, Mr. Nelson calculated a net
6  present value of the expected stream of royalties of $4,135,000
7  under the Profit Share Obligation at $1,975,235.  After
8  deducting the $305,367.00 already paid by Cirtran, ABS asserted
9  that CirTran owed $1,669,958 (the "Asserted Royalty Payment").
10
11     15.  The Court entered the Default Judgment on March 17,
12  2009.

13     16.  Thereafter, on April 16, 2009, a "Writ of Execution"
14 was issued by the Clerk of the United States Bankruptcy Court of
15 the Central District of California.  On July 9, 2009, ABS levied
16 one of CirTran's bank accounts and $4,986.15 was seized from
17 CirTran's bank account.  On July 17, 2009, ABS levied additional
18 accounts (most of which were not CirTran accounts) in excess of
19 $150,000.00.  With the exception of approximately $10,000.00
20 obtained from a "CirTran Corporation" account, the other monies
21 were wrongfully seized from accounts that were not CirTran
22 accounts.  After Mr. Hawatmeh had multiple discussions with
23 representatives from the bank throughout the day, with the
24 exception of approximately $10,000.00, the remainder of the
25 monies were transferred back to the respective accounts.  See
26 ¶ 15 of the Hawatmeh Declaration.
27
28
8

**C. CIRTRAN'S FACTUAL STATEMENTS IN RESPONSE TO THE DEFAULT JUDGMENT.**

17. Iehab Hawatmeh, President and Chief Executive Officer of CirTran, is the agent for service of process for CirTran. Mr. Hawatmeh never received the Second Complaint nor the DJ Motion. See ¶¶ 16 & 17 of the Hawatmeh Declaration.

18. In the normal course of business, Mr. Hawatmeh reviews the mail that CirTran receives on a regular basis. Although Mr. Hawatmeh travels a great deal for CirTran, he is ordinarily apprised of legal documents that are sent to his attention. In the past, and prior to his departure on or about December 2008, David Harmon, the Chief Financial Officer, and Raquel Williams, Mr. Hawatmeh's executive assistant, reviewed Mr. Hawatmeh's mail in his absence. Mr. Harmon nor Ms. Williams ever discussed receiving the Second Complaint with Mr. Hawatmeh. After Mr. Harmon's departure, Ms. Williams would review Mr. Hawatmeh's mail in his absence. Ms. Williams never discussed receiving the DJ Motion with Mr. Hawatmeh. See ¶ 17 of the Hawatmeh Declaration.

19. CirTran has paid ABS a total of $315,096.00 since the closing of the Purchase Agreement. CirTran concedes that it did not pay the balance of $132,810.40 of the Anniversary Payment.

20. However, CirTran only owes royalties in the amount of $22,360.60 (in addition to the $132,810.40) *not* $1,669,958 for Units sold under the Profit Share Obligation. Indeed, only 13,158 Units have been sold which entitles ABS to $22,360.60

9

1  (the "Royalty Payment"). Attached as Exhibit "B" to the
2  Hawatmeh Declaration is a true and correct copy of an accounting
3  that reflects the Units sold and the outstanding Royalty Payment
4  potentially payable to ABS.

5       21.  Moreover, any purported amount owed by CirTran must be
6  offset by CirTran's Allowed Claim in the amount of $1.6 million.
7  See Purchase Agreement, ¶ 2.4(a), p. 10.
8
9       22.  Despite ABS's allegations that CirTran failed to
10 provide an accounting of all Units sold, ABS fails to mention in
11 its Motion that CirTran provided a monthly accounting to ABS for
12 the months of June 2006 to December 2008. See ¶ 21 Hawatmeh
13 Declaration.

14      23.  As a consequence, prior to the Court entering the
15 Default Judgment, ABS was fully aware that the Asserted Royalty
16 Payment was grossly overstated in comparison to the Royalty
17 Payment and would result in a windfall to ABS.

18 **D.  ABS'S ACTIONS AFTER THE CLOSING OF THE PURCHASE AGREEMENT.**

19      24.  As part of the Purchase Agreement, CirTran purchased
20 all rights, title and interest to intellectual property owned by
21 ABS (the "Intellectual Property"), including, but not limited
22 to, copyrights, patents, trademarks, service marks, and trade
23 names, except as set forth therein. See Purchase Agreement,
24 ¶¶ 2.1(b) and 4.5(a)(iv), pp. 8 & 16. The Intellectual Property
25 included, among other things, certain media plans (the "Media
26 Plans"). See ¶ 22 of the Hawatmeh Declaration.
27
28
                                    10

1    25.  After the closing of the Purchase Agreement, Mr. Dodo,
2   the Chief Executive Officer of the reorganized ABS, has engaged
3   in business activities that are harmful to CirTran's business.
4   Specifically, Mr. Dodo has partnered and/or joint ventured with
5   TriStar (who also bid for ABS's assets at the auction) and used
6   his knowledge of the Intellectual Property to manufacture and
7   sell the same exact Unit purchased by CirTran under the Purchase
8   Agreement.  TriStar is selling its replicated unit under the
9   tradename of "Kstyler."  See ¶ 23 of the Hawatmeh Declaration.
10  Moreover, Mr. Dodo has created infomercials for Kstyler that are
11  similar to the infomercials for the Unit by using the same
12  concept and the same company to produce the infomercials.
13  Additionally, Mr. Dodo has used the Media Plans that are part of
14  the Intellectual Property and the accounting to market the
15  Kstyler product and solicit customers that would otherwise be
16  CirTran customers.  See ¶ 23 of the Hawatmeh Declaration.
17
18
19                        **II. DISCUSSION**
20
    **A.   THE COURT HAS DISCRETION TO SET ASIDE THE DEFAULT JUDGMENT**
21       **PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 60(b).**
22
         Federal Rule of Civil Procedure 60(b) ("Rule 60(b)")
23
    provides, in relevant part, that the Court may relieve a party
24
    from a final judgment, order, or proceeding for the following
25
    reasons:
26
27           (1)  mistake, inadvertence, surprise, or
             excusable neglect;
28
                            11

1

2          (2) newly discovered evidence that, with
reasonable diligence, could not have been

3          discovered in time to move for a new trial
under Rule 59(b);

4          (3) fraud (whether previously called
intrinsic or extrinsic), misrepresentation,

5          or misconduct by an opposing party;

6          (4) the judgment is void;

7          (5) the judgment has been satisfied,

8          released or discharged; it is based on an
earlier judgment that has been reversed or

9          vacated; or applying it prospectively is no
longer equitable; or

10

11         (6) any other reason that justifies relief.

12 Fed. R. Civ. Pro. 60(b). While a court has discretion to grant

13 or deny a motion to vacate a default judgment pursuant to Rule

14 60(b), that discretion is limited by three important

15 considerations. Schwab v. Bullock's Inc. ("Schwab"), 508 F.2d

16 353, (9th Cir. 1974). First, Rule 60(b) is remedial in nature

17 and therefore must be liberally applied. Id., citing Butner v.

18 Neustadter, 324 F.2d 783, 786 (9th Cir. 1963). Second, default

19 judgments are generally disfavored; whenever it is reasonably

20 possible, cases should be decided on their merits. Id., citing

21 Patapoff v. Vollstedt's Inc., 267 F.2d 863, 865 (9th Cir.

22 1959). Third, and as a consequence of the first two

23 considerations, "where timely relief is sought from a default

24 judgment and the movant has a meritorious defense, doubt, if

25 any, should be resolved in favor of the motion to set aside the

26 judgment so that cases may be decided on their merits." Id.

27

28

1  In this instance, CirTran respectfully requests that the

2  Default Judgment be set aside pursuant to Rule 60(b)(1).

3  **B.   THE FACTORS TO BE CONSIDERED IN VACATING DEFAULT JUDGMENTS.**

4  When a default judgment is challenged on grounds of

5  excusable neglect, the Court must consider the following three

6  factors in vacating a default judgment: (1) whether reopening

7  the default judgment would prejudice the plaintiff; (2) whether

8

9  the defendant has a meritorious defense; and (3) whether the

10  defendant's culpable conduct led to the default.  Falk v. Allen

11  ("Falk"), 739 F.2d 461, 463 (9th Cir. 1984); TCI Group Life Ins.

12  Plan v. Knoebber ("TCI"), 244 F.3d 691, 695-96 (9th Cir. 2001);

13  Employee Painters' Trust v. Ethan Enterprises, Inc., 480 F.3d

14  993 (9th Cir. 2007); Larry Morris, dba Morris Motors v. Peralta

15  (In re Peralta)("Peralta"), 317 B.R. 381 (9th Cir. BAP 2004);

16  citing 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane,

17  Federal Practice & Procedure: Civil 3d §§ 2694-96 (3d ed. 1998)

18  ("Wright & Miller").

19  As set forth below, the application of the aforementioned

20  factors, coupled with the policy considerations underlying Rule

21  60(b), require that the Default Judgment be set aside.

22

23  *1.   There is no prejudice that would result to ABS if the Default Judgment is set aside.*

24  The Court must consider whether vacating the default

25  judgment would prejudice ABS.  TCI, 244 F.3d at 701.  To be

26  prejudicial, the setting aside of a judgment must result in

27  greater harm than simply delaying resolution of the case.  Id.

28
13

1  Rather, "the standard is whether [plaintiff's] ability to

2  pursue his claim will be hindered." Id. As set forth in TCI:

3          It should be obvious why merely being forced
        to    litigate   on   the   merits   cannot   be
4          considered   prejudicial   for   purposes   of
        lifting a default judgment. For had there
5          been no default, the plaintiff would of
        course have had to litigate the merits of
6          the case, incurring the costs of doing so. A
        default   judgment   gives   the   plaintiff
7          something of a windfall by sparing her from
        litigating the merits of her claim because
8          of   her   opponent's   failure   to   respond;
        vacating   the   default   judgment   merely
9          restores the parties to an even footing in
10         the litigation.

11 TCI, 244 F.3d at 701, citing Bateman v. United States Postal

12 Service, 231 F.3d 1220, 1225 (9th Cir. 2000)(no prejudice simply

13 because a party loses a quick victory due to an opponent's

14 procedural default and must litigate on the merits).

15     CirTran filed the instant motion less than three months

16
17 after the Default Judgment was entered. There is no material

   prejudice that would result to ABS from setting aside the
18
   Default Judgment, since, to be considered prejudicial, "the
19
20 delay [in setting aside a default] must result in tangible harm

21 such as loss of evidence, increased difficulties of discovery,

22 or greater opportunity for fraud or collusion." Falk, 739 F.2d

23 at 463. The "ordinary cost of litigating is simply not

24 cognizable under Falk's prejudice factor." TCI, 244 at 701.

25 ///

26 ///

27

28
                                 14

1      ***2. The Default Judgment Must Be Set Aside Because CirTran
has meritorious defenses and counterclaims.***

2

3      A defendant seeking to vacate a default judgment must

4  present specific facts that would constitute a defense.

5  However, the burden on a party seeking to vacate a default

6  judgment is not extraordinarily heavy. TCI, 244 F.3d at 700,

7  citing In re Stone, 588 F.2d 1316, 1319 n. 2 (10th Cir. 1978)

8  (explaining that the movant need only demonstrate facts or law

9  showing the trial court that "a sufficient defense is

10 assertible"). As discussed by the Ninth Circuit, "[where an]

11 allegation was sufficient to raise [a] defense ... the question

12 whether the factual allegation was true would be the subject of

13 the later litigation." Falk, 739 F.2d at 463.

14

15     In this instance, there are very specific facts that

16 establish that CirTran has several meritorious defenses and

17 counterclaims to the Second Amended Complaint and the Default

18 Judgment which require that the Default Judgment be set aside.

19     ***a. CirTran has meritorious defenses to the amount of
damages sought in the Second Complaint and the DJ Motion.***

20

21     The Second Complaint requests, among other things, a

22 judgment for compensatory, consequential and punitive damages.

23 The Second Complaint alleged that ABS's damages were subject to

24 proof at trial. However, the DJ Motion requested damages in the

25 total amount of $1,808,233, comprised in large part of the

26 Asserted Royalty Payment based on the Expert Report.

27

28

                                           15

1   The Asserted Royalty Payment is overstated by at least
2   $1,647,597.40 in comparison to the outstanding Royalty Payment.
3   See Exhibit "B."  While ABS may have an Expert Report based on
4   false assumptions of Units sold, CirTran has accounting records
5   that evidence "actual" Units sold.  Moreover, the Specific
6   Performance Provision specifically provides that money damages
7   would be incalculable for any breach of the Purchase Agreement.
8   As a consequence, the only basis for calculating damages are
9   "actual" Units sold times $3.00 pursuant to the terms of the
10  Purchase Agreement.  Accordingly, ABS is only entitled to the
11  Royalty Payment of $22,360.60.
12

13  Based on the foregoing, ABS has meritorious defenses to the
14  Second Complaint and to the amount of damages requested by ABS
15  in the DJ Motion.  Indeed, the amount of the Default Judgment
16  would *not* be supportable by ABS at trial; as a result, if the
17  Default Judgment is not set aside, CirTran will be significantly
18  prejudiced.  Wright & Miller, 8 Judgment, § 2697.  Accordingly,
19  the Court should vacate the Default Judgment to avoid any such
20  prejudice and in light of CirTran's meritorious defenses and the
21  lack of prejudice to ABS.  Schwab, 508 F.2d at 355 ("The
22  meritoriousness of the defense coupled with the lack of any
23  significant prejudice to plaintiff should have led the district
24  court to resolve in [the defendant's] favor any doubts in
25  connection with the motion to vacate.  This the district court
26  failed to do.").
27
28
                          16

*b.   CirTran's counterclaims against ABS based on actions taken by ABS and Mr. Dodo.*

As discussed above, after the closing of the Purchase Agreement, Mr. Dodo, the Chief Executive Officer of the reorganized ABS, has engaged in business activities that are harmful to CirTran's business.  Specifically, Mr. Dodo partnered and/or joint ventured with TriStar and is manufacturing and selling Kstyler, the same exact Unit purchased by CirTran under the Purchase Agreement.

Moreover, Mr. Dodo has, among other things, used the Media Plans to market Kstyler and solicit the same customers that CirTran would otherwise target.  CirTran believes that ABS has infringed upon CirTran's copyrights by doing so.  Additionally, Mr. Dodo has used the accounting sent to ABS (the accounting which ABS asserts that it did not receive) to determine which infomercial times and channels yield the most sales of the Units only to use that information to sale Kstyler.  CirTran has lost sales as a result of TriStar's direct competition in the same market.

Based on the foregoing, and as to be more specifically pled in any answer filed by CirTran (assuming the Default Judgment is set aside), CirTran believes it has meritorious counterclaims against ABS that sound in, among other things, intentional interference with prospective economic advantage, copyright infringement, unfair competition, breach of contract, breach of the covenant of good faith and fair dealing under the Purchase

17

1   Agreement, and unjust enrichment. These counterclaims would

2   more than offset any amount of damages purportedly owed to ABS.

3       Moreover, CirTran's counterclaims against ABS, including,

4   but not limited to, breach of contract, copyright infringement,

5   breach of the covenant of good faith and fair dealing and unjust

6   enrichment, are compulsory counterclaims because there is a

7   "logical relationship" between ABS's claims and CirTran's

8   counterclaims and the Purchase Agreement is the basis for both

9   parties' claims. Newbery Corp. v. Fireman's Fund Ins. Co., 95

10  F.3d 1392 (9th Cir. 1996)("In deciding whether the relevant

11  claims arose from the same transaction, the district court

12  applied the 'logical relationship' test outlined by the Supreme

13  Court in Moore v. New York Cotton Exchange, 270 U.S. 593, 46

14  S.Ct. 367, 70 L.Ed. 750 (1926). In Moore, the Court stated that

15  '[t]ransaction' is a word of flexible meaning. It may comprehend

16  a series of many occurrences, depending not so much upon the

17  immediateness of their connection as upon their logical

18  relationship."); Albright v. Gates, 362 F.2d 928, 929 (9th Cir.

19  1966)("In deciding what is a transaction, we take note that the

20  term gets an increasingly liberal construction. Two bundles of

21  facts seldom are identical for comparing 'transactions,' and so

22  close judgments must be made from time to time."); Wright &

23  Miller, § 1410 (When the same contract serves as the basis for

24  both the claims and counterclaims, the logical relationship

25  standard is satisfied and, as a result, the counterclaims are

28

1  compulsory.)(other citations omitted). Indeed, both claims
2  would involve an interpretation of the Purchase Agreement, the
3  parties' performance thereunder and share common witnesses.
4  Since CirTran's failure to have the opportunity to plead its
5  compulsory counterclaims could preclude CirTran from raising the
6  same matter in an independent action, there would be material
7  prejudice to CirTran if the Default Judgment is not set aside.
8
   ***3.   CirTran's culpable conduct did not lead to the Default***
9  ***Judgment.***

10     The concept of the defendant's "culpability" under Rule
11 60(b) is construed to be consistent with the Supreme Court's
12 definition of "excusable neglect" in the context of retroactive
13 extensions of time under rules of procedure. TCI, 244 F.3d at
14 696. "That concept, the Supreme Court has made clear, is a
15 general equitable one, not necessarily reserved for
16 extraordinary circumstances, and takes account of factors such
17 as 'prejudice, the length of the delay and impact on judicial
18 proceedings, the reason for the delay, including whether it was
19 within the reasonable control of the movant, and whether the
20 movant acted in good faith.'" Pioneer Inv. Servs. Co. v.
21 Brunswick Assocs. Ltd. P'ship, 507 U.S. 380, 395, 113 S.Ct.
22 1489, 123 L.Ed.2d 74 (1993)(other citations omitted); TCI, 244
23 F.3d at 696.
24
25     The usual articulation of the governing standard is that "a
26 defendant's conduct is culpable if he has received actual or
27 constructive notice of the filing of the action and
28
                                  19

1  *intentionally* failed to answer."  TCI, 244 F.3d at 696.  The

2  "intentional" conduct is generally found where a party's actions

3  were "willful, deliberate, or [there is] evidence of bad faith."

4  Id.  However, "[n]eglectful failure to answer as to which the

5  defendant offers a credible, good faith explanation negating any

6  intention to take advantage of the opposing party, interfere

7  with judicial decisionmaking, or otherwise manipulate the legal

8  process is not 'intentional' under [the Ninth Circuit's] default

9  cases, and is therefore not necessarily -- although it certainly

10  may be, once the equitable factors are considered -- culpable or

11  inexcusable."  Id.

12

13       Here, CirTran's failure to answer the Second Complaint or

14  respond to the DJ Motion was excusable since CirTran received

15  neither the Second Complaint nor the DJ Motion and its failure

16  to answer was not "intentional."  See ¶¶ 16 & 17 of the Hawatmeh

17  Declaration annexed hereto.   Mr. Hawatmeh reviews the mail

18  received by CirTran on a regular basis in the ordinary course of

19  business.  However, he did not receive the Second Complaint nor

20  the DJ Motion.[1]   See ¶ 17 of the Hawatmeh Declaration annexed

21  hereto. Although Mr. Hawatmeh has traveled a great deal during

22  the last year for CirTran, he has implemented certain procedures

23

24

25

---

[1] The proof of service of the Second Complaint and the DJ Motion shows that
26  they were only served by regular mail.

27

28

1  whereby Mr. Harmon and Ms. Williams reviewed the mail on a
2  regular basis in his absence.

3      Neither Mr. Harmon nor Ms. Williams informed Mr. Hawatmeh
4  of receipt of either the Second Complaint or the DJ Motion.
5  Indeed, if Mr. Hawatmeh were aware that the DJ Motion existed
6  that requested entry of the Default Judgment, Mr. Hawatmeh would
7  have taken steps to respond to the DJ Motion, particularly since
8
9  the DJ Motion requested damages well in excess of what is
   actually owed to ABS.
10
11     Simply put, Mr. Hawatmeh was not aware of the DJ Motion and
12 the related pleadings.[2] Mr. Hawatmeh had no intention of taking
13 advantage of ABS, interfering with judicial decisionmaking, or
14 otherwise manipulating the legal process.  Indeed, CirTran has
15 already paid ABS over $1.4 million under the Purchase Agreement,
16 and is prepared to honor its actual contractual obligations
17 thereunder, if any (net of the counterclaims).

18     Moreover, only three months have passed since the Court
19 entered the Default Judgment, which is well within the one-year
20 year limit imposed by Rule 60.  There is also no "prejudice" to
21 ABS as that term is defined in this Circuit and as thoroughly
22 discussed in section 1 above.
23

24

25
   [2] "On a Rule 60(b) motion, [the Court] will accept the allegations of the
26 movant's factual statement."   Falk, 739 F.2d at 464.

27

28
                                   21

1    Based on all of the foregoing factors and the policy

2  considerations underlying Rule 60(b), the Court should set

3  aside the Default Judgment and allow the parties to litigate

4  the underlying merits.   Schwab, 508 F.2d at 355("[D]efault

5  judgments are generally disfavored; whenever it is reasonably

6  possible, cases should be decided on their merits.")(other

7  citations omitted).

8
### III. CONCLUSION
9

10    Based upon all of the foregoing, the CirTran respectfully

11  requests that the Court enter an Order: (i) granting the motion

12  in its entirety; (ii) setting aside the Default Judgment; and

13  (iii) granting such other and further relief as is just and

14  proper under the circumstances.

15
DATED: July 20, 2009                   CIRTRAN CORPORATION
16
                                       By:_____
17                                          DAVID L. NEALE
                                            TANIA M. MOYRON
18                                          LEVENE, NEALE, BENDER,
                                              RANKIN & BRILL L.L.P.
19                                          Special Counsel for
                                            CirTran Corporation
20

21

22

23

24

25

26

27

28
                              22

**DECLARATION OF IEHAB J. HAWATMEH**

I, Iehab J. Hawatmeh, hereby declare as follows:

1.    I have personal knowledge of the facts set forth below and, if called to testify, I would and could competently testify thereto.

2.    I am the President and Chief Executive Officer of CirTran Corporation ("CirTran").

3.    I make this declaration in support of the motion (the "Motion") filed by CirTran for the entry of an order setting aside the default judgment (the "Default Judgment") entered against CirTran for the reasons set forth below.

4.    On or about May 2006, Advanced Beauty Solutions, LLC ("ABS") and CirTran entered into a purchase agreement (the "Purchase Agreement"), which was approved by order of the Bankruptcy Court. Attached as Exhibit "A" hereto is a true and correct copy of the Purchase Agreement. Pursuant to Section 2.4 of the Purchase Agreement, CirTran purchased substantially all of ABS's assets for the following consideration:

> (a)    The aggregate consideration for the Assets (the "Purchase Price") shall be the following: (i) a cash payment in the amount of $1,125,000, (ii) reduction of Purchaser's $2,350,000 allowed general unsecured claim in the Bankruptcy Case by $750,000, leaving Purchaser with an allowed general unsecured claim in the amount of $1,600,000 [the "Allowed Claim"], (iii) the assumption of the Assumed Liabilities; and (iv) obligation to pay Seller $3.00 per True Ceramic Pro flat iron unit (a "Unit") sold by Purchaser in accordance with Section 2.4(b) and pursuant to the Settlement Agreement, the

23

Global Settlement, and the Settlement Order (the "Profit Share Obligation").

5. Section 2.4(b) of the Purchase Agreement provides that CirTran's obligation to pay ABS the Profit Share Obligation shall be capped at $4,135,000. See Purchase Agreement, p. 10 ¶ 2.4. This section further provides that to the extent the amounts paid to ABS on account of the Profit Share Obligation equal less than $435,000 on the second year anniversary of the closing, then, within 30 days of such anniversary, CirTran shall pay ABS an amount equal to $435,000 less the payments made to date (the "Anniversary Payment").

6. Section 2.4 (c) of the Purchase Agreement provides that CirTran shall provide an accounting of all sales used to calculate the Profit Share Obligation.

7. On or about June 20, 2006, CirTran made a cash payment to ABS in the amount of $1,125,000 as contemplated by the Purchase Agreement.

8. By March 28, 2008, CirTran had paid ABS the total sum of $305,367.00, which represented the majority of the Anniversary Payment as part of the Profit Share Obligation.

9. On March 9, 2007, ABS filed a "Complaint for (1) Breach of Contract; (2) Account Stated; (3) Unjust Enrichment; (4) Accounting and (5) Receivership" (the "First Complaint") against CirTran.

24

10. Shortly thereafter, the parties reached a settlement agreement that resulted in, among other things, the dismissal of the First Complaint and the related adversary proceeding.

11. I am informed and believe that, on May 29, 2008, ABS commenced a second adversary proceeding by filing a complaint (the "Second Complaint") against CirTran which contained allegations that mirrored the First Complaint. CirTran did not receive the Second Complaint and, as a consequence, did not file an answer to the Second Complaint.

12. I am informed and believe that, on February 24, 2009, ABS filed a motion for a default judgment (the "DJ Motion") to be entered against CirTran. The DJ Motion requested a judgment in the amount of \$1,808,233.00, plus post judgment interest and \$3,444.45, comprised primarily of the following: (1) \$129,633.00 of the Anniversary Payment that was outstanding; (2) \$1,669,958 purportedly outstanding as part of the Profit Share Obligations based on an expert report (the "Expert Report") prepared by Richard Nelson; and (3) costs.

13. In the Expert Report, Mr. Nelson calculated a net present value of the expected stream of royalties of \$4,135,000 under the Profit Share Obligation at \$1,975,235. After deducting the \$305,367.00 paid by Cirtran, ABS asserted that CirTran owed \$1,669,958 (the "Asserted Royalty Payment").

14. I am informed and believe that the Court entered the Default Judgment on March 17, 2009.

25

15. On July 9, 2009, ABS levied one of CirTran's bank accounts and $4,986.15 was seized from CirTran's bank account. On July 17, 2009, ABS levied additional accounts (most of which were not CirTran accounts) in excess of $150,000.00. With the exception of approximately $10,000.00 obtained from a "CirTran Corporation" account, I believe that the other monies were wrongfully seized because they were seized from accounts that were not accounts of "CirTran Corporation." After I had multiple discussions with representatives from the bank throughout the day on July 17, 2009, with the exception of approximately $10,000.00, the remainder of the monies were transferred back to the respective accounts.

16. I am the agent for service of process for CirTran. I never received the Second Complaint nor the DJ Motion.

17. In the normal course of business, I review the mail that CirTran receives on a regular basis. Although I travel a great deal for CirTran, I am ordinarily apprised of legal documents that are sent to my attention. In the past, and prior to his departure on or about December 2008, David Harmon, the Chief Financial Officer, and Raquel Williams, my executive assistance, reviewed my mail in my absence. Mr. Harmon nor Ms. Williams ever discussed receiving the Second Complaint with me. After Mr. Harmon's departure, Ms. Williams would review my mail in my absence. Ms. Williams ever discussed receiving the DJ Motion with me.

26

18. CirTran has paid ABS a total of $315,096.00 since the closing of the Purchase Agreement. CirTran concedes that it did not pay $132,810.40 of the Anniversary Payment.

19. However, CirTran only owes royalties in the amount of $22,360.60 *not* $1,669,958 for Units sold under the Profit Share Obligation. Indeed, only 13,158 Units have been sold which entitles ABS to $22,360.60 (the "Royalty Payment"). Attached as Exhibit "B" is a true and correct copy of an accounting that reflects the Units sold and the outstanding Royalty Payment potentially payable to ABS.

20. Moreover, CirTran has an Allowed Claim in the amount of $1.6 million in ABS's bankruptcy estate.

21. Despite ABS's allegations that CirTran failed to provide an accounting of all Units sold, CirTran provided a monthly accounting to ABS for the months of June 2006 to December 2008.

22. As part of the Purchase Agreement, CirTran purchased all rights, title and interest to intellectual property owned by ABS (the "Intellectual Property"), including, but not limited to, copyrights, patents, trademarks, service marks, and trade names, except as set forth therein. The Intellectual Property included, among other things, certain media plans (the "Media Plans").

23. After the closing of the Purchase Agreement, Mr. Dodo, the Chief Executive Officer of the reorganized ABS, has engaged

27

1   in business activities that are harmful to CirTran's business.

2   Specifically, Mr. Dodo has partnered and/or joint ventured with

3   TriStar (who also bid on the purchase of ABS's assets at the

4   auction) and used his knowledge of the Intellectual Property to

5   manufacture and sell the same exact Unit purchased by CirTran

6   under the Purchase Agreement.  TriStar is selling its replicated

7   unit under the tradename of "Kstyler."  Moreover, Mr. Dodo has

8   created infomercials for Kstyler that are similar to the

9   infomercials for the Unit by using the same concept and the same

10  company to produce the infomercials.  Additionally, Mr. Dodo has

11  used the Media Plans and the accounting to market the Kstyler

12  product and solicit customers that would otherwise be CirTran

13  customers.

14

15      Executed on this 20th day of July, 2009, at West Valley

16  City, Utah.

17                                          Iehab J. Hawatmeh

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT "A"

EXHIBIT _A_

**ASSET PURCHASE AGREEMENT**

**dated as of**

**May __, 2006**

**by and between**

**ADVANCED BEAUTY SOLUTIONS, LLC,**

**and**

**CIRTRAN CORPORATION**

*EXHIBIT A*

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT, dated as of May __, 2006, is made by and between CirTran Corporation, a Nevada corporation, and/or its designee (collectively, "**Purchaser**"), and Advanced Beauty Solutions, LLC, a California limited liability company ("**Seller**"), as debtor and debtor-in-possession in the chapter 11 case (the "**Bankruptcy Case**") pending in the United States Bankruptcy Court for the Central District of California, San Fernando Valley Division (the "**Bankruptcy Court**").

WHEREAS, Seller has been in the business of manufacturing, marketing, advertising, and selling consumer beauty products (the "**Business**");

WHEREAS, on January 24, 2006 (the "**Filing Date**"), Seller filed a voluntary petition with the Bankruptcy Court under chapter 11 of title 11 of the United States Code, Section 101, et seq. (the "**Bankruptcy Code**"); and

WHEREAS, Seller desires to sell substantially all of its assets to Purchaser, and Purchaser desires to purchase and acquire substantially all of the assets of Seller upon the terms and subject to the conditions set forth herein;

NOW, THEREFORE, IN CONSIDERATION OF THE FOREGOING, OF THE REPRESENTATIONS, WARRANTIES, COVENANTS AND MUTUAL AGREEMENTS HEREINAFTER CONTAINED, AND OF OTHER GOOD AND VALUABLE CONSIDERATION, RECEIPT AND SUFFICIENCY OF WHICH ARE HEREBY ACKNOWLEDGED, THE PARTIES AGREE AS FOLLOWS:

### ARTICLE I

### DEFINITIONS

The terms defined in this **Article 1**, whenever used herein (including without limitation the Exhibits and Schedules hereto), shall have the following meanings for all purposes of this Agreement:

"**Actual Inventory**" means the number of non-defective, saleable Units transferred to Purchaser on the Closing Date pursuant to this Agreement.

"**Affiliate**" of a Person means any other Person that directly or indirectly through one or more intermediaries controls, is controlled by, or is under common control with such Person.

"**Agreement**" means this agreement among the parties set forth on the first page hereof, including, without limitation, all Exhibits and Schedules hereto, as the same may be amended from time to time.

"**AMS**" means Advantage Media Services, Inc.

### *EXHIBIT A*

# EXHIBIT 1
# Page 27

"**Apportioned Obligations**" has the meaning set forth in **Section 6.6** hereof.

"**Assets**" has the meaning set forth in **Section 2.1** hereof.

"**Assumed Contracts**" has the meaning set forth in **Section 2.1(c)** hereof.

"**Assumed Liabilities**" has the meaning set forth in **Section 2.3** hereof.

"**Bankruptcy Case**" has the meaning given to it in the recitals hereto.

"**Bankruptcy Code**" has the meaning given to it in the recitals hereto.

"**Bankruptcy Court**" has the meaning given to it in the recitals hereto.

"**Bidding Procedures Order**" means the "Order: (1) Establishing Bidding Procedures in Connection with Sale of the Debtor's Business Assets; (2) Setting a Hearing Date for a Final Bidding Round with Qualified Bidders and Confirming the Sale of the Debtor's Business Assets Free and Clear of Liens; and (3) Approving Manner of Notice to be Provided to Creditors and Parties in Interest," which was entered by the Bankruptcy Court in the Bankruptcy Case on February 24, 2006.

"**Bill of Sale**" has the meaning set forth in **Section 2.5(a)** hereof.

"**Business**" has the meaning given to it in the recitals hereto.

"**Business Day**" means any day other than a Saturday, Sunday or other day on which commercial banks in New York City are required or authorized by law to be closed.

"**Closing**" means the closing of the transactions contemplated by this Agreement.

"**Closing Date**" means the date in which the conditions set forth in **Article VII** are satisfied or waived, or such other date as the parties may mutually agree, upon which the Closing takes place. The Closing Date shall be no later than June 6, 2006 unless the Bankruptcy Court issues an order extending this deadline.

"**Code**" means the Internal Revenue Code of 1986, as amended, and the Treasury Regulations promulgated thereunder.

"**Consent**" means any consent, approval, authorization, license or order of, registration, declaration or filing with, or notice to, or waiver from, any federal, state, local, foreign or other Governmental Entity or any Person, including, without limitation, any security holder or creditor which is necessary to be obtained, made or given in connection with the execution and delivery of this Agreement and/or any Operative Document, the performance by a Person of its obligations hereunder and/or thereunder and the consummation of the transactions contemplated hereby and/or thereby.

"**Datapak**" means Datapak Services Corporation.

*EXHIBIT A*

*Page 28*

# EXHIBIT 1
# Page 28

"**Defective Units**" has the meaning set forth in **Section 3.1(a)** hereof.

"**Deposit**" has the meaning set forth in **Section 2.4(d)** hereof.

"**Directly or Indirectly**" means as an individual, partner, shareholder, member, creditor, director, officer, principal, agent, employee, trustee, consultant, advisor or in any other relationship or capacity.

"**Disclosure Schedule**" means the disclosure schedule attached to this Agreement as **Exhibit 1**, and includes but is not limited to each of the Schedules expressly referred to in **Article IV**.

"**Encumbrances**" means collectively, any and all security interests, liens, pledges, claims, defenses, setoffs, rights of recoupment, leases, levies, charges, escrows, encumbrances, options, rights of first refusal, transfer restrictions, conditional sale contracts, title retention contracts, mortgages, hypothecations, indentures, security agreements or other agreements, arrangements, contracts, commitments, understandings or obligations of any kind whatsoever, whether written or oral.

"**Environment**" means any surface or subsurface physical medium or natural resource, including, air, land, soil, surface waters, ground waters, stream and river sediments.

"**Environmental Laws**" means any federal, state, local or common law, rule, regulation, ordinance, code, order or judgment (including the common law and any judicial or administrative interpretations, guidances, directives, policy statements or opinions) relating to the injury to, or the pollution or protection of, human health and safety or the Environment.

"**Environmental Liabilities**" means any claims, judgments, damages (including punitive damages), losses, penalties, fines, liabilities, encumbrances, liens, violations, costs and expenses (including attorneys' and consultants' fees) of investigation, assessment, remediation or defense of any matter relating to human health, safety or the Environment of whatever kind or nature by any Person or Governmental Entity, (A) which are incurred as a result of (i) the existence of Hazardous Substances in, on, under, at or emanating from any Real Property, (ii) the off-site transportation, treatment, storage or disposal of Hazardous Substances generated by Seller, or (iii) the violation of any Environmental Laws, or (B) which arise under the Environmental Laws.

"**Estimated Inventory**" has the meaning set forth in **Section 3.1(a)** hereof.

"**Excluded Assets**" has the meaning set forth in **Section 2.2** hereof.

"**Excluded Liabilities**" shall mean all of the debts, liabilities or obligations of Seller other than the Assumed Liabilities, including, without limitation, the Environmental Liabilities, Taxes accruing prior to the Pre-Closing Tax Period, and liabilities for product returns and quality claims in respect of products manufactured and sold by Seller prior to the Closing Date.

*EXHIBIT A*

*Page 29*

# EXHIBIT 1
# Page 29

"**Filing Date**" has the meaning given to it in the recitals hereto.

"**GAAP**" means United States generally accepted accounting principles, applied on a consistent basis.

"**General Assignment**" has the meaning set forth in **Section 2.5(a)** hereof.

"**Global Settlement**" means the settlement that was reached among Seller, ICG, MFC, Datapak, Tristar, AMS, and Purchaser regarding, among other things, the distributions to be made from the proceeds of the sale of the Assets pursuant to this Agreement.

"**Governmental Entity**" means any federal, state, local or foreign government, political subdivision, legislature, court, agency, department, bureau, commission or other governmental regulatory authority, body or instrumentality, including any industry or other non-governmental self-regulatory organizations.

"**Hazardous Substance**" means petroleum, petroleum products, petroleum-derived substances, radioactive materials, hazardous wastes, polychlorinated biphenyls, lead based paint, radon, urea formaldehyde, asbestos or any materials containing asbestos, and any materials or substances regulated or defined as or included in the definition of "hazardous substances," "hazardous materials," "hazardous constituents," "toxic substances," "pollutants," "contaminants" or any similar denomination intended to classify or regulate substances by reason of toxicity, carcinogenicity, ignitability, corrosivity or reactivity under any Environmental Law.

"**ICG**" means Inventory Capital Group, Inc.

"**Independent Auditor**" has the meaning given to it in **Section 3.2(b)** hereof.

"**Infomercial** means the True Ceramic Pro – Live Ops (TCP5) infomercial and the master tapes relating to the same and owns all trademarks, patents, patent applications and copyrights relating to the True Ceramic Pro product and all advertising and marketing materials relating thereto.

"**Insider Noteholders**" means Jason Dodo, Direct Success, John Miller, Pacstar and Kiss'D Inc.

"**Insider Noteholders Claim**" means the $2,100,000 aggregate claim of the Insider Noteholders, which is expected to be allowed pursuant to the Settlement Order.

"**Instruments of Assignment**" has the meaning set forth in **Section 2.5(a)** hereof.

"**Instruments of Assumption**" has the meaning set forth in **Section 2.5(b)** hereof.

"**Lease Assignment**" has the meaning set forth in **Section 2.5(a)** hereof.

"**Marks**" has the meaning as set forth in **Section 4.5(a)(iii)** hereof.

"**Material Adverse Effect**" means a material adverse effect (financial or otherwise) on (a) the Business or on the results of operations, condition or prospects of the Business, taken as a whole, or the ability of Buyer to succeed to or exercise rights or interests of Sellers that are necessary to operate the Business, taken as a whole, or (b) the ability of Sellers to consummate the transactions contemplated by this Agreement, taken as a whole, including material delays of the Closing, other than effects directly arising as a result of (i) the performance of this Agreement or (ii) events, changes or developments relating to the financial, banking or capital markets or the economy in general or industry-wide developments affecting Persons in businesses similar to the Business.

"**MFC**" means Media Funding Corporation.

"**Operative Document**" means any agreement, instrument or other document to be executed and delivered in connection with the consummation of the transactions contemplated by this Agreement and shall include, without limitation, any item that is set forth in **Sections 2.10 and 2.11** hereof.

"**Other Instruments**" has the meaning set forth in **Section 2.5(a)** hereof.

"**Person**" means an individual, corporation, partnership, limited liability company, firm, joint venture, association, joint stock company, trust, unincorporated organization or other entity, or any Governmental Entity or quasi-governmental body or regulatory authority.

"**Permits**" means all licenses, certificates of authority, permits, orders, consents, approvals, registrations, local siting approvals, authorizations, qualifications and filings under any federal, state or local laws or with any Governmental Entities or other private Persons.

"**Post-Closing Tax Period**" shall mean (i) any Tax period beginning the day after the Closing Date and (ii) with respect to a Tax period that commences before but ends after the Closing Date, the portion of such period beginning the day after the Closing Date.

"**Pre-Closing Tax Period**" shall mean (i) any Tax period ending on or before the Closing Date and (ii) with respect to a Tax period that commences before but ends after the Closing Date, the portion of such period up to and including the Closing Date.

"**Profit Share Obligation**" has the meaning set forth in **Section 2.4(a)** hereof.

"**Property**" (or "**Properties**" when the context requires) means any Real Property and any personal or mixed property, whether tangible or intangible.

"**Purchase Price**" has the meaning set forth in **Section 2.4(a)** hereof.

"**Purchaser**" has the meaning given to it in the recitals hereto.

"**Reduced Claim**" has the meaning set forth in **Section 3.1(a)** hereof.

*EXHIBIT A*

*Page 31*

# EXHIBIT 1
# Page 31

"**Sale Approval Order**" has the meaning set forth in **Section 6.5(c)** hereof.

"**Sale Hearing**" has the meaning set forth in **Section 6.5(b)** hereof.

"**Seller**" has the meaning given to it in the recitals hereto.

"**Seller Intellectual Property Rights**" has the meaning set forth in **Section 4.5(a)** hereof.

"**Seller License Rights**" has the meaning set forth in **Section 4.5(b)** hereof.

"**Seller's Representative**" has the meaning set forth in **Section 9.15** hereof.

"**Seller Rights**" has the meaning set forth in **Section 4.5(b)** hereof.

"**Seller Rights Assignment**" has the meaning set forth in **Section 2.5(a)** hereof.

"**Settlement Agreement**" means that certain Settlement Agreement dated as of January 24, 2006 by and among Seller, ICG, and MFC.

"**Settlement Order**" means the "Order Approving Settlement and Compromise of Disputed Secured Claims of Inventory Capital Group, Inc., and Media Funding Corporation as Modified in Open Court to Address Allowance and Payment of Other Claims," which was entered by the Bankruptcy Court in the Bankruptcy Case on _____, 2006, and which, among other things, approved the Settlement Agreement and the Global Settlement.

"**Taxes**" (or "**Tax**" where the context requires) shall mean all federal, state, county, provincial, local, foreign and other taxes (including, without limitation, income, profits, premium, estimated, excise, sales, use, occupancy, gross receipts, franchise, ad valorem, severance, capital levy, production, transfer, withholding, employment and payroll related and property taxes and other governmental charges and assessments), whether attributable to statutory or nonstatutory rules and whether or not measured in whole or in part by net income, and including, without limitation, interest, additions to tax or interest, charges and penalties with respect thereto, and expenses associated with contesting any proposed adjustment related to any of the foregoing.

"**Trade Secrets**" means any information which (i) is used in a business, (ii) is not generally known to the public or to Persons who can obtain economic value from its disclosure, and (iii) is subject to reasonable efforts to maintain its secrecy or confidentiality; the term may include but is not limited to inventions, processes, know-how, formulas, computer software, and mask works which are not patented and are not protected by registration (e.g., under copyright or mask work laws); lists of customers, suppliers, and employees, and data related thereto; business plans and analyses; and financial data.

"**Tristar**" means Tristar Products, Inc.

"**Undertaking**" has the meaning set forth in **Section 2.5(b)** hereof.

*EXHIBIT A*

*Page 32*

# EXHIBIT 1
# Page 32

"**Unit**" has the meaning set forth in **Section 2.4** hereof.

## ARTICLE II

## SALE AND PURCHASE OF ASSETS; CLOSING

2.1     Asset Purchase. Upon the terms and subject to the conditions hereof, and upon the basis of the agreements, representations and warranties contained in this Agreement, on the Closing Date, Seller agrees to sell, transfer, assign, convey and deliver to Purchaser, and Purchaser shall purchase, acquire and accept from Seller, all of Seller's right, title and interest in and to all of the assets, properties and rights of Seller, as and to the extent existing on the Closing Date (such assets, properties and rights are hereinafter collectively referred to as the "**Assets**"), free and clear of all Encumbrances. Without limitation of the foregoing, the Assets include the following as and to the extent existing on the Closing Date:

(a)     Personal Property. All personal property owned by Seller, including but not limited to those set forth on **Schedule 2.1(a)**;

(b)     Intellectual Property. All right, title and interest to intellectual property owned by Seller, including but not limited to the Infomercial and the Seller Rights set forth on **Schedules 4.5(a), 4.5(a)(i), 4.5(a)(ii), 4.5(a)(iii)** and **(b)**;

(c)     Contracts. All executory contracts and unexpired leases set forth on **Schedule 2.1(c)(i)** to which Seller is a party and which are being assumed and assigned to Purchaser in connection with this Agreement (the "**Assumed Contracts**") as well as all Assets, rights, and privileges of Seller under or relating to: (i) the Assumed Contracts and (ii) all contracts or leases to which Seller is or was a party that are not capable of being assumed and/or assigned under Section 365 of the Bankruptcy Code, including but not limited to those set forth on **Schedule 2.1(c)(ii)**;

(d)     Inventory. All raw materials, work-in-process, finished goods and merchandise, past and future customer returns of finished goods, packaging materials and other supplies related thereto that are owned by Seller, including but not limited to those set forth on **Schedule 2.1(d)**;

(e)     Insurance. All rights of Seller under insurance policies covering the Assets or the Business, including but not limited to those set forth on **Schedule 4.7**;

(f)     Deposits and Prepaid Expenses. All deposits and prepaid expenses, including but not limited to those set forth on **Schedule 2.1(f)**;

(g)     Books and Records. All general, financial and personnel records, correspondence and other files and records (whether in electronic form or otherwise), including customer and supplier lists, customer files, data, pricing and cost information, purchase and sale records, sales and promotional materials, property records, financial and accounting records, compliance records, parts lists, manuals, patterns, plans, and all blueprints, drawings, formulas,

APA-Final-Clean-May-25-2006      *EXHIBIT A*

*Page 33*

# EXHIBIT 1
# Page 33

and manufacturing specifications, of Seller (provided, however, that Seller shall be provided reasonable access to such books and records and other documents as necessary to fulfill its duties as debtor-in-possession and may make copies of such books and records and documents for such purpose);

(h)     Goodwill. All goodwill and other intangibles owned by Seller;

(i)     Causes of Action. Except to the extent specifically excluded under **Section 2.2(i)** of this Agreement or being settled as part of the Global Settlement, all causes of action, rights of recovery and rights of set-off owned by Seller, including but not limited to those set forth on **Schedule 2.1(i)**;

(j)     Permits. All of Seller's rights, title and interest in and to any and all Permits, licenses, permits, approvals and authorizations by a federal, state, local or foreign governmental or non-governmental board, bureau, agency or regulatory body owned by Seller, to the extent transferable or assignable, including but not limited to those set forth on **Schedule 2.1(j)**;

(k)     Customer and Supplier Lists. All customer and supplier lists and related information of Seller, as well as all existing advertising plans of any kind, sales literature and related items.

(l)     Telephone Numbers and Listings. All of Seller's telephone, cell phone, and facsimile numbers, e-mail listings and addresses, web sites, post office boxes, and all listings in all telephone books, directories, and web sites, including but not limited to those set forth on **Schedule 2.1(l)**.

2.2     Excluded Assets.     Any provision of this Agreement to the contrary notwithstanding, Purchaser shall not acquire and there shall be excluded from the Assets the following (the "**Excluded Assets**"):

(a)     all cash or cash equivalents on hand or held by Seller in bank, brokerage, or other accounts as set forth on **Schedule 2.2(a)**;

(b)     all marketable securities as set forth on **Schedule 2.2(b)**;

(c)     all executory contracts and unexpired leases that are not Assumed Contracts, including, but not limited to, those set forth on **Schedule 2.2(c)**;

(d)     accounts and monetary obligations receivable as set forth on **Schedule 2.2(d)** and original records representing such accounts and monetary obligations receivable of Seller, including, but not limited to, invoices, ledgers, and proofs of delivery;

(e)     credit card reserves of Seller held by TransFirst and ePayment Services of Omaha NE as set forth on **Schedule 2.2(e)**;

(f)     any assets that Purchaser designates in writing within 120 days following the Closing to leave in the possession or ownership of Seller;

APA-Final-Clean-May-25-2006                    *EXHIBIT A*

*Page 34*

# EXHIBIT 1
# Page 34

(g)     Seller's interest, if any, in the $75,000 retainer paid to Seller's bankruptcy counsel, Shulman Hodges & Bastian LLP, in the Bankruptcy Case;

(h)     any Hazardous Substances; and

(i)     All bankruptcy avoidance claims of Seller, including, without limitation, any claims arising under Sections 544, 545, 547, 548 549, 550 and 551 of the Bankruptcy Code.

2.3     Assumed Liabilities. Except as otherwise expressly provided in this **Section 2.3**, Purchaser shall not assume or be responsible for, and shall in no event be liable for any debts, liabilities or obligations of Seller, whether fixed or contingent, known or unknown, liquidated or unliquidated, suspected or unsuspected, material or immaterial, absolute or contingent, matured or unmatured, determinable or undeterminable, direct or indirect, secured or unsecured, or otherwise. As the sole exceptions to the first sentence of this **Section 2.3**, effective as of the Closing Date, Purchaser hereby assumes and agrees to pay, discharge or perform, as appropriate, (i) the obligations of Seller under the Assumed Contracts that accrue after the Closing Date and (ii) the cure payments in connection with the executory contracts and/or unexpired leases in the respective amounts set forth on **Schedule 2.3** (collectively, the "**Assumed Liabilities**").

2.4     Consideration. (a)  The aggregate consideration for the Assets (the "**Purchase Price**") shall be the following: (i) a cash payment in the amount of $1,125,000, (ii) reduction of Purchaser's $2,350,000 allowed general unsecured claim in the Bankruptcy Case by $750,000, leaving Purchaser with an allowed general unsecured claim in the amount of $1,600,000, (iii) the assumption of the Assumed Liabilities, and (iv) obligation to pay Seller $3.00 per True Ceramic Pro flat iron unit (a "**Unit**") sold by Purchaser in accordance with **Section 2.4(b)** and pursuant to the Settlement Agreement, the Global Settlement, and the Settlement Order (the "**Profit Share Obligation**").

(b)     The Profit Share Obligation shall be due upon Purchaser's receipt of payment in full for a Unit and payable on a monthly basis on the last day of each month based upon payments received during the previous month. Thus, on July 31, 2006, Purchaser shall pay Seller $3.00 per Unit for each Unit paid for in full between June 1, 2006 and June 30, 2006. The Profit Share Obligation shall be capped at $4,135,000. Purchaser agrees that to the extent the amounts paid to Seller on account of the Profit Share Obligation equal less than $435,000 on the 2 year anniversary of the Closing, then, within 30 days of such anniversary, Purchaser shall pay Seller an amount equal to $435,000 less the payments made to date.

(c)     Commencing on July 31, 2006 and no later than the last day of each month thereafter, Purchaser shall provide to Seller an accounting of all sales used to calculate the Profit Share Obligation. Seller shall have the right, at its expense, to audit any such accounting provided and Purchaser shall make available to Seller all documents and information reasonably necessary to confirm the accuracy of such accounting and Purchaser's satisfaction of the Profit Share Obligation. In the event such audit reveals a discrepancy in Seller's favor resulting in an increase in the Profit Share Obligation due and owing, Seller shall remit such amount within 2 business days of discovery by Seller and if such increase results in a variance of more than 10%

APA-Final-Clean-May-25-2006                  *EXHIBIT A*

*Page 35*

# EXHIBIT 1
# Page 35

and $5,000 of the amount due and owing by Purchaser for any monthly period, Purchaser shall reimburse Seller for all reasonable expenses incurred in performing such audit.

(d)     The Purchase Price shall be allocated among the Assets as set forth on **Schedule 2.4(c)**.

(e)     As of the date hereof, Purchaser has delivered to counsel for Seller a deposit (together with any interest accrued thereon, the "**Deposit**") in the amount of $100,000 to be held in accordance with the terms of this Agreement and the Bidding Procedures Order, and applied to the cash portion of the Purchase Price at Closing. In the event of termination of this Agreement, the Deposit shall be disbursed as provided in **Section 9.2(b)**.

(f)     In the event Purchaser defaults on the Profit Share Obligation by failing to make any payment as and when due, and Purchaser has not cured such default within 30 days of notice of such default, Seller shall have the right to pursue all remedies available under law and equity.

    2.5     Transfer of Assets and Assumed Liabilities.

(a)     At the Closing, Seller shall effect the sale, conveyance, assignment, transfer and delivery of the Assets to Purchaser by delivering to Purchaser or its designee each of the following: (i) a duly executed bill of sale, substantially in the form of **Exhibit 3** hereto (the "**Bill of Sale**"); (ii) a duly executed assignment of real property leases with respect to the leased Real Property, substantially in the form of **Exhibit 4** hereto (the "**Lease Assignment**"); (iii) a duly executed assignment and assumption agreement relating to the Assumed Contracts, Permits and other Assets, substantially in the form of **Exhibit 5** hereto (the "**General Assignment**"); (iv) a duly executed assignment of Seller Rights, substantially in the form of **Exhibit 6** hereto (the "**Seller Rights Assignment**"); and (v) such other good and sufficient instruments of conveyance and transfer (collectively, the "**Other Instruments**" and, together with the Bill of Sale, the General Assignment, the Lease Assignment and Seller Rights Assignment, the "**Instruments of Assignment**") as are reasonably necessary to vest in Purchaser good and valid title to the Assets, free and clear of all Encumbrances, except the Assumed Liabilities.

(b)     At the Closing, Purchaser shall deliver to Seller an undertaking, substantially in the form of **Exhibit 7** hereto (the "**Undertaking**"), whereby Purchaser shall assume and agree to perform, pay, or discharge, when due, the Assumed Liabilities, effective as of the Closing, and such other instruments, documents or agreements (collectively, the "**Instruments of Assumption**") as are reasonably necessary to evidence Purchaser's assumption of and agreement to pay and discharge the Assumed Liabilities.

    2.6     Possession. Right to possession of the Assets shall transfer to Purchaser on the Closing Date. Seller shall transfer and deliver to Purchaser on the Closing Date such keys, lock and safe combinations and other similar items as Purchaser shall require to obtain immediate and full occupation and control of the Assets, and shall also make available to Purchaser at Seller's then existing locations all documents in Seller's possession that are required to be transferred to Purchaser by this Agreement.

*EXHIBIT A*

*Page 36*

# EXHIBIT 1
# Page 36

2.7    Transfer Taxes. Provided that the Sale Approval Order (as defined in **Section 6.5(c)** hereof) includes the finding set forth in clause (xiii) of **Section 6.5(c)** in accordance with Section 1146(a) of the Bankruptcy Code, the making or delivery of any instrument of transfer, including the filing of any deed or other document of transfer to evidence, effectuate or perfect the rights, transfers and interest contemplated by this Agreement, shall be in contemplation of a plan to be confirmed under Section 1129 of the Bankruptcy Code in the Bankruptcy Case, and such shall be free and clear of any and all transfer tax, stamp tax or similar taxes. Such instruments, orders and agreements transferring the Assets to Purchaser shall contain the following endorsement:

> "Because this [instrument] has been authorized pursuant to an order of the United States Bankruptcy Court for the Central District of California (San Fernando Valley Division), in contemplation of a chapter 11 plan of the Grantor, it is exempt from transfer taxes, stamp taxes or similar taxes pursuant to 11 U.S.C. §1146(a)."

If such transfer, stamp or similar taxes are ultimately payable, notwithstanding Section 1146(a) of the Bankruptcy Code or for any other reason, Seller shall pay any and all such transfer, stamp or similar taxes, which may be payable by reason of the transaction contemplated in this Agreement and any and all claims, charges, interest or penalties assessed, imposed or asserted in relation to any such taxes.

2.8    Non-Assignable Permits.

(a)    To the extent that any Permit included among the Assets is not capable of being assigned to Purchaser at the Closing without the Consent of the issuer thereof, or if such assignment or attempted assignment would constitute a breach thereof, or a violation of any applicable federal, state, local or foreign law, statute, ordinance, rule, regulation, order, judgment or decree, administrative order or decree, administrative or judicial decision, and any other executive or legislative proclamation    , neither this Agreement nor any Instrument of Assignment shall constitute an assignment thereof, or an attempted assignment, unless such Consent has been obtained.

(b)    In the event that any Consent referred to in **Section 2.8(a)** has not been obtained prior to the Closing and Purchaser nevertheless determines to effect the Closing, Seller shall use its commercially reasonable efforts, and Purchaser shall cooperate with Seller, to obtain each and every such Consent and to resolve the impracticalities of assignment referred to in **Section 2.8(a)** after the Closing; provided, however, that each party shall bear its own costs and expenses, and neither Seller nor Purchaser shall be obligated to pay any consideration therefore to the Person from whom the Consent is requested (other than filing and similar fees payable to any Governmental Entity customarily paid in connection with transactions of the type contemplated hereby).

(c)    To the extent that Consents referred to in **Section 2.8(a)** have not been obtained by Seller prior to the Closing and Purchaser nevertheless determines to effect the Closing, until the impracticalities of assignment referred to in **Section 2.8(a)** hereof are resolved,

AFA-Final-Clean-May-25-2006                      **EXHIBIT A**

*Page 37*

# EXHIBIT 1
# Page 37

Seller shall use its commercially reasonable efforts to (i) provide Purchaser the benefits of any Permit referred to in **Section 2.8(a)**, (ii) cooperate in any reasonable and lawful arrangement designed to provide such benefits to Purchaser, without incurring any financial obligation to Purchaser, and (iii) enforce for the account and benefit of Purchaser any and all rights of Seller arising from the Permits referred to in **Section 2.8(a)** against such issuer thereof (including the right to elect to terminate in accordance with the terms thereof on the advice of Purchaser).

(d)     To the extent that Purchaser is provided the benefits pursuant to **Section 2.8(c)** of any Permit, Purchaser shall perform, on behalf of Seller, for the benefit of the issuer thereof, and/or all other parties thereto, the obligations of Seller thereunder or in connection therewith, but only to the extent that (i) such action by Purchaser would not result in any material default thereunder or in connection therewith and (ii) such obligation would have been an Assumed Liability but for the non-assignability or non-transferability thereof.

2.9     The Closing. The Closing shall take place at 9:00 a.m., local time, on the Closing Date, at the offices of McDermott Will & Emery LLP, 2049 Century Park East, 34th Floor, Los Angeles, California, or at such other time, date or place as the parties may mutually agree, subject to the satisfaction or waiver of all of the conditions to Closing set forth in **Article VII** hereof. At the Closing, Purchaser and Seller shall deliver or cause to be delivered the items necessary to convey, assign, transfer and deliver the Assets to Purchaser.

2.10     Deliveries by Sellers. At the Closing, Seller shall deliver, or cause to be delivered, to Purchaser each of the following, duly executed by or on behalf of Sellers:

(a)     the Bill of Sale referred to in **Section 2.5(a)** hereof;

(b)     the Lease Assignment referred to in **Section 2.5(a)** hereof;

(c)     the General Assignment referred to in **Section 2.5(a)** hereof;

(d)     Seller Rights Assignment referred to in **Section 2.5(a)** hereof;

(e)     the Other Instruments referred to in **Section 2.5(a)** hereof;

(f)     executed copies of the Consents referred to in **Section 7.1(c)** hereof;

(g)     the officer's certificate of Seller referred to in **Section 7.1(e)** hereof;

(h)     a copy of the Sale Approval Order referred to in **Section 6.5(c)** hereof;

(i)     a copy of the Settlement Order referred to in **Section 6.5(f)** hereof; and

(j)     a copy of the Bankruptcy Court's docket sheet for the Bankruptcy Cases evidencing that there has been no appeal or stay of the Sale Approval Order.

2.11     Deliveries by Purchaser. At the Closing, Purchaser shall deliver or cause to be delivered to Seller each of the following, duly executed by or on behalf of Purchaser:

# EXHIBIT 1
# Page 38

(a)     an amount equal to the cash portion of the Purchase Price (less the amount of the Deposit), by wire transfer of immediately available funds to the account or accounts designated in writing by Seller at least two (2) Business Days prior to the Closing Date;

(b)     the Undertaking referred to in **Section 2.5(b)** hereof;

(c)     the Instruments of Assumption referred to in **Section 2.5(b)** hereof; and

(d)     the officer's certificate of Purchaser referred to in **Section 7.2(e)** hereof.

## ARTICLE III

### PURCHASE PRICE ADJUSTMENT

3.1     Purchase Price Adjustments. The following adjustments to the Purchase Price shall be made:

(a)     Inventory Adjustment. On or before the third Business Day prior to the Closing Date, Seller and Purchaser shall jointly agree on an estimate of the Actual Inventory to be transferred to Purchaser on the Closing Date (the "**Estimated Inventory**"). The Estimated Inventory shall be determined in good faith on a reasonable basis using then available information of Seller and based upon the books and records of Seller. The defective units identified on **Schedule 3.1(a)** (the "**Defective Units**") shall be included in the calculation of Estimated Inventory. In the event the Actual Inventory is less than the value of $376,000 based on the quantity listed on **Schedule 3.1(a) and Schedule 2.1(d)**, then the Insider Noteholders Claim shall be reduced dollar for dollar in an amount equal to the cost value allocated to such missing Inventory or Defective Units that are not replaced or repaired to the reasonable satisfaction of Purchaser (the "**Reduced Claim**"). In the event the Actual Inventory is greater than the value of $376,000 based on the quantity listed on **Schedule 3.1(a) and Schedule 2.1(d)**, there shall be no upward adjustment in the Purchase Price or the Insider Noteholders Claim and no reduction in Purchaser's allowed claim in the Bankruptcy Case.

3.2     Calculation of Actual Inventory. The determination of the Actual Inventory shall be made pursuant to the following provisions:

(a)     Seller agrees to use its best efforts to repair or replace any Defective Units within thirty (30) days after the Closing Date. Any Defective Units will not be included in the calculation of Actual Inventory unless and until they are repaired or replaced. Failure of Seller to repair or replace the Defective Units shall result in the Reduced Claim.

(b)     Within forty-five (45) days after the Closing Date, Purchaser shall prepare a calculation of Actual Inventory as of the close of business on the Closing Date (subject to adjustment set forth herein above) in accordance with GAAP and deliver to Seller' Representative such calculation of Actual Inventory.

*EXHIBIT A*

*Page 39*

**EXHIBIT 1**
**Page 39**

(c)     The Seller's Representative will have a period of thirty (30) days
following the delivery of the calculation of Actual Inventory to notify Purchaser of any
disagreements with the calculation of Actual Inventory. Failure to notify Purchaser within such
30-day period shall be deemed acceptance of such calculation. In the event Seller's
Representative timely notifies Purchaser of any disagreement, the parties agree that each of them
shall attempt in good faith to resolve such disagreements. If within thirty (30) days after delivery
to Purchaser of the notification by Seller's Representative of a disagreement, the parties are
unable to resolve such disagreement, either Seller's Representative, on the one hand, or
Purchaser, on the other hand, shall have the right to submit the determination of such matters to
an independent accountant of national standing reasonably acceptable to Seller's Representative
and Purchaser (the "**Independent Auditor**"), whose decision shall be binding on the parties.
The cost of the Independent Auditor shall be paid by the party whose aggregate estimate of the
disputed amount or amounts, as the case may be, differs most greatly from the determination of
the Independent Auditor.

## ARTICLE IV

### REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents and warrants to Purchaser, to the best of its knowledge
and belief, as follows (all such representations and warranties are qualified by the Disclosure
Schedule attached to this Agreement as **Exhibit 1**):

4.1     INTENTIONALLY OMITTED

4.2     Authority.

(a)     Seller has all requisite power and authority to execute and deliver this
Agreement and the Operative Documents to which it is or shall, pursuant to this Agreement, be a
party, and to perform, carry out and consummate the transactions contemplated hereby and
thereby. The execution, delivery and performance of this Agreement and the Operative
Documents to which it is or shall, pursuant to this Agreement, be a party have been duly
authorized by all necessary action on the part of Seller. This Agreement has been duly executed
and delivered by Seller and constitutes the legal, valid and binding obligation of Seller,
enforceable against Seller in accordance with its terms.

(b)     INTENTIONALLY OMITTED

4.3     Title to Assets.  Upon the Closing and transfer to Purchaser of the Assets,
Purchaser shall receive good and marketable title to all of the Assets free and clear of any and all
Encumbrances, pursuant to Section 363 of the Bankruptcy Code and any other applicable
sections of the Bankruptcy Code and as set forth in the Sale Approval Order.

4.4     Real Property Leases.  **Schedule 4.4** of the Disclosure Schedule contains a
complete and correct list of all Real Property leased by Seller. Seller has previously delivered to

*EXHIBIT A*

*Page 40*

# EXHIBIT 1
# Page 40

Purchaser true, complete and correct copies of all lease documents relating to such Real
Property.

        4.5    Intellectual Property.

        (a)    Except as disclosed in **Schedule 4.5(a)** of the Disclosure Schedule, Seller
is the exclusive owner of all right, title and interest in and to all of the intellectual property in
which Seller has an ownership interest or that has been used in the Business of Seller, and/or has
been or is being developed or acquired for potential use in the Business of Seller and/or that has
been promoted, sold, licensed or otherwise distributed by Seller to any third parties, including,
but not limited to, each of the following:

        (i)    all copyrights and copyright registrations set forth in
**Schedule 4.5(a)(i)** of the Disclosure Schedule;

        (ii)    all patents and applications set forth in **Schedule 4.5(a)(ii)** of the
Disclosure Schedule;

        (iii)    All trademarks, service marks and tradenames (collectively the
"**Marks**"), and the registrations of, and/or applications to register, any one or more of the Marks
in federal, state or foreign jurisdictions set forth in **Schedule 4.5(a)(iii)** of the Disclosure
Schedule; and

        (iv)    all Trade Secrets and other proprietary rights.

        The items referred to in subparagraphs (i) through (iv) of this **Section 4.5(a)** are
herein referred to collectively as the "**Seller Intellectual Property Rights**." The Seller
Intellectual Property Rights constitute all such rights necessary to operate the Business of Seller
as it is has been conducted in the past three years.

        (b)    **Schedule 4.5(b)** of the Disclosure Schedule sets forth a list of all license
and similar agreements between Seller and third parties, under which Seller is granted rights to
the use, reproduction, distribution, manufacture, sale or licensing of items embodying the patent,
copyright, Trade Secret, trademark or other proprietary rights of such third parties (collectively,
the "**Seller License Rights**"). Except as disclosed in **Schedule 4.5(b)**, Seller is not, nor will
Seller be as a result of the execution and delivery of this Agreement or the consummation of the
transactions contemplated thereby, in violation of or will lose any rights pursuant to any license
and similar agreements described in **Schedule 4.5(b)** of the Disclosure Schedule. Except as set
forth in **Schedules 4.5(a)** and **4.5(b)** of the Disclosure Schedule, no Person is entitled to any
royalty, fee and/or other payment or other consideration of whatever nature with respect to Seller
License Rights or Seller Intellectual Property Rights. The Seller License Rights and Seller
Intellectual Property Rights are sometimes collectively referred to as the "**Seller Rights**".

        (c)    **Schedule 4.5(c)** of the Disclosure Schedule sets forth a list of all
agreements under which Seller has granted any rights of whatever nature to third parties of, to or
under Seller Rights. Except as set forth in **Schedule 4.5(c)**, all such rights granted shall be

      *EXHIBIT A*

*Page 41*

# EXHIBIT 1
# Page 41

terminated as of the Closing Date. True, correct and complete copies of all such agreements have been delivered to Purchaser.

(d) No claims with respect to Seller Rights have been asserted or, to the knowledge of Seller, are threatened by any Person, nor does Seller know of any valid grounds for any bona fide claims against the use by Seller of any Seller Rights. To the knowledge of Seller, there has not been any infringement, misappropriation or any other unauthorized use of any of the Seller Rights by any third party, employee, consultant or former employee or consultant of Seller.

(e) Seller has not, by reason of its use, license, sale or other distribution of the Seller Rights or otherwise, nor has Seller been alleged to have, infringed upon, violated, misappropriated or misused any intellectual property right or other proprietary right (including, without limitation, any patent right, copyright, trade name or Trade Secret) of any third party.

4.6 Contracts and Commitments. **Schedule 4.6** of the Disclosure Schedule contains a complete and correct list of each contract and agreement to which Seller is a party. Seller has previously delivered to Purchaser true, complete and correct copies of all such contracts and agreements, together with all amendments thereto.

4.7 Insurance. **Schedule 4.7** of the Disclosure Schedule contains a true and complete list of all insurance policies covering Seller or otherwise held by or on behalf of it, or any aspect of its Assets or Business, indicating the type of coverage, name of insured, the insurer, the amount of coverage, the deductibles, the premium, and the expiration date. Except as set forth in **Schedule 4.7**, there are no pending claims under any of the foregoing.

4.8 INTENTIONALLY OMITTED

4.9 INTENTIONALLY OMITTED

4.10 Environmental Matters. Except as set forth on **Schedule 4.10**, Seller is not subject to any material Environmental Liabilities.

4.11 INTENTIONALLY OMITTED

4.12 INTENTIONALLY OMITTED

4.13 INTENTIONALLY OMITTED

4.14 Finders. None of Seller nor any of Seller's directors, officers, members, or managers, have taken any action that, Directly or Indirectly, would obligate Purchaser or Seller, to anyone acting as broker, finder, financial advisor or in any similar capacity in connection with this Agreement or any of the transactions contemplated hereby.

4.15 Disclosure. No representation or warranty by Seller in this Agreement, in any documents or papers furnished to Purchaser or its representatives by or on behalf of Seller, pursuant to this Agreement or any statement contained in the Disclosure Schedule or any certificates delivered hereunder contains or will contain any untrue statement of material fact or

APA-Final-Clean-May-25 2006 *EXHIBIT A*

*Page 42*

# EXHIBIT 1
## Page 42

omits to state a material fact required to be stated therein or necessary to make the statements
contained therein in light of the circumstances under which it was made, not false or misleading.
All copies of contracts, agreements and other documents made available to Purchaser or any of
its representatives pursuant hereto are complete and accurate.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

Purchaser hereby represents and warrants as follows:

5.1     Organization and Qualification. It is duly organized, validly existing and
in good standing in its jurisdiction of organization.

5.2     Authority. It has all requisite power and authority to execute and deliver
this Agreement and to perform, carry out and consummate the transactions contemplated hereby.
The execution, delivery and performance of this Agreement have been duly authorized by all
necessary corporate action on its part. This Agreement has been duly executed and delivered by
it and constitutes its legal, valid and binding obligation, enforceable against it in accordance with
its terms.

5.3     No Breach. Neither the execution and delivery of this Agreement by it nor
the consummation of the transactions contemplated herein and the full performance by it of its
obligations hereunder do or will: (i) violate any provision of its organizational documents; (ii)
conflict with, violate, result in a breach of or constitute a default under any writ, injunction,
statute, law, ordinance, rule, regulation, judgment, award, decree, order, or process of any
Governmental Entity; or (iii) require it to obtain any Consent.

## ARTICLE VI

## COVENANTS

6.1     Conduct of Business of Seller. Purchaser acknowledges that Seller has not
been in operation since before the Filing Date. From the date hereof and until the Closing Date,
except as contemplated by this Agreement or expressly consented to by an instrument in writing
signed by Purchaser, Seller shall: (i) maintain and preserve the Assets in good repair, order and
condition, including, without limitation, performing, in a manner and on a basis consistent with
past practice, all periodic maintenance and necessary reconditioning, (ii) endeavor in good faith
to preserve its business operations and organizations intact, (iii) endeavor in good faith to
preserve its current advantageous business relationships, including, without limitation, the
goodwill of its customers and suppliers and others having business relationships with it, and (iv)
not enter into any agreement or make any other commitment involving an amount in excess of
$25,000. Without limiting the generality of the foregoing, and, except as contemplated in this
Agreement, prior to the Closing Date Seller shall use all commercially reasonable efforts to not

# EXHIBIT 1
# Page 43

take any action that would result in the incorrectness as of the Closing Date of any representation and warranty contained in **Article IV** without the prior written consent of Purchaser.

6.2     Sellers Records. Prior to the Closing Date, Seller shall afford Purchaser, its attorneys, accountants and representatives, free and full access to Seller's Business, books, records and employees, and shall provide to Purchaser and its representatives such additional financial and operating data and other information as Purchaser shall from time to time reasonably request. Seller shall permit Purchaser to contact customers and suppliers of Seller for determining and verifying the precise terms and nature of their arrangements.

6.3     Filings and Authorizations. Each of Seller and Purchaser, as promptly as practicable, (i) shall make, or cause to be made, all such filings and submissions under laws, rules and regulations applicable to it or its Affiliates, as may be required to consummate the transactions contemplated herein, in accordance with the terms of this Agreement, (ii) shall use all commercially reasonable best efforts to obtain, or cause to be obtained, all authorizations, approvals, consents and waivers from all governmental and non-governmental Persons necessary to be obtained by it or its Affiliates, in order to consummate the transactions contemplated herein; provided, however, that, any provision hereof to the contrary notwithstanding, Seller shall have no obligation to (A) pay any fee to any third party for the purpose of obtaining any Consent or any costs and expenses of any third party resulting from the process of obtaining such Consent or (B) sell any material portion of the Business; provided further, however, that neither Purchaser nor Seller shall be obligated to consummate the transactions contemplated by this Agreement absent the prior approval of the Bankruptcy Court and neither Purchaser nor Seller shall be obligated to modify the Agreement in any material respect to satisfy the Bankruptcy Court, and (iii) shall use all commercially reasonable efforts to take, or cause to be taken, all other actions necessary, proper or advisable in order for him, her or it to fulfill his, her or its obligations hereunder. The Sellers and Purchaser shall coordinate and cooperate with one another in exchanging such information and supplying such reasonable assistance as may be reasonably requested by each in connection with the foregoing.

6.4     Further Assurances. Simultaneous with the Closing, Seller shall take such steps as may be necessary to put Purchaser in actual possession and operating control of the Assets and the Business. At or after the Closing, Sellers shall, at the reasonable request of Purchaser, without further consideration, promptly execute and deliver, or cause to be executed and delivered, to Purchaser such assignments, bills of sale, consents and other instruments in addition to those required by this Agreement, in form and substance reasonably satisfactory to Purchaser, and take all such other actions as Purchaser may reasonably deem necessary or desirable to implement any provision of this Agreement and to more effectively transfer to and vest in Purchaser, and to put Purchaser in possession of, all of the Assets, free and clear of any and all Encumbrances.

6.5     Bankruptcy Covenants.

(a)     Cure of Defaults. Seller shall promptly, on or prior to the Closing Date, cure any and all defaults and breaches and satisfy any liability or obligation arising from or relating to pre-Closing periods under the Assumed Contracts, except as expressly assumed by Purchaser under this Agreement, so that such Assumed Contracts may be assigned by Sellers to

APA-Final-Clean-May-25-2006          *EXHIBIT A*

*Page 44*

**EXHIBIT 1**
**Page 44**

Purchaser in accordance with the provisions of section 365 of the Bankruptcy Code, the Sale Approval Order, any other orders of the Bankruptcy Court effectuating such assignments, and this Agreement.

(b)    Motions, Orders, etc. Seller shall promptly provide Purchaser with the proposed final drafts of all documents, motions, orders, or pleadings that Seller proposes to file with the Bankruptcy Court which relate to the approval of this Agreement, the Settlement Agreement, the Global Settlement, the Assets, or the consummation of the transactions contemplated hereby, or any provision therein or herein, and shall provide Purchaser and its counsel with a reasonable opportunity to review and comment on such documents, motions, orders, or pleadings. Seller shall promptly notify Purchaser of any hearing relating to the approval of this Agreement (the "**Sale Hearing**"), the Settlement Agreement, the Global Settlement, or the consummation of the transactions contemplated hereby.

(c)    Sale Approval Order. Without limiting the generality of the foregoing **Section 6.5(b)**, the sale approval order, in the form annexed hereto as **Exhibit 2** (the "**Sale Approval Order**"), shall be acceptable in form and substance to Purchaser and shall include provisions, among other things (i) providing that Purchaser shall not incur any liability as a successor to the Business, (ii) approving the sale of the Assets to Purchaser on the terms and conditions set forth in this Agreement and authorizing Seller to proceed with this transaction, (iii) stating that any objections filed with respect to the sale of the Assets, which have not been withdrawn, are overruled or the interests of such objections have been otherwise satisfied or adequately provided for by the Bankruptcy Court, (iv) finding that the Purchase Price represents fair value for the Assets, (v) finding that the sale is in the best interests of Seller's estate and creditors, (vi) finding that Purchaser is a good faith purchaser of the Assets under Section 363(m) of the Bankruptcy Code and that the provisions of Section 363(n) of the Bankruptcy Code have not been violated, (vii) providing that the sale of the Assets to Purchaser shall be free and clear of all Encumbrances whatsoever under section 363 of the Bankruptcy Code and any other applicable sections of the Bankruptcy Code, (viii) providing that the Bankruptcy Court shall retain jurisdiction for the purpose of enforcing the provisions of the Sale Approval Order including, without limitation, compelling delivery of the Assets to Purchaser and protecting Purchaser against any Encumbrances against Seller or the Assets, (ix) finding that there are no brokers involved in consummating the sale and no brokers' commissions are due, (x) providing that the parties hereto shall be authorized to close this transaction immediately upon execution of the Sale Approval Order pursuant to Rules 6004(g) and 6006(d) of the Federal Rules of Bankruptcy Procedure, (xi) authorizing and directing Seller to execute, deliver, perform under, consummate and implement this Agreement, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the foregoing, (xii) determining that Purchaser is not a successor to Seller or otherwise liable for any of the Excluded Liabilities or Excluded Assets and permanently enjoining each and every holder of any of the Excluded Liabilities or Excluded Assets from commencing, continuing or otherwise pursuing or enforcing any remedy, claim, cause of action or Encumbrance against Purchaser or the Assets related thereto, (xiii) finding that, pursuant to Section 1146(a) of the Bankruptcy Code, the within transaction is "in contemplation of a plan to be confirmed under Section 1129 of the Bankruptcy Code in the Bankruptcy Case," and as such shall be free and clear of any and all transfer tax, stamp tax or similar taxes, and (xiv) declaring that Seller owns all the copyrights to the True Ceramic Pro – Live Ops (TCP5) infomercial and the master tapes relating to the same

*EXHIBIT A*

*Page 45*

# EXHIBIT 1
# Page 45

and owns all trademarks, patents, patent applications and copyrights relating to the True Ceramic Pro product and all advertising and marketing materials relating thereto, and (xv) declaring that any licenses to Seller's Intellectual Property (or any third party's contributed as part of the sale), including patents, copyrights, and trademarks, granted to third parties prior to the Closing shall be nullified as of the Closing Date. To the extent that there is any inconsistency between this paragraph and the Sale Approval Order, the Sale Approval Order shall govern.

(d)     Assumed Contracts.  Seller shall not reject under Section 365 of the Bankruptcy Code, waive or release any of its rights under, amend or otherwise modify any of the Assumed Contracts without the prior written consent of Purchaser.  Seller shall obtain an order or orders (which may include the Sale Approval Order) in a form satisfactory to Purchaser, among other things (i) approving the assumption and assignment of the Assumed Contracts to Purchaser pursuant to, and subject to the provisions of, Section 365 of the Bankruptcy Code, (ii) providing that all defaults of Seller under the Assumed Contracts arising or accruing prior to the date of the Closing (without giving effect to any acceleration clauses or any default provisions in such contracts of a kind specified in Section 365(b)(2) of the Bankruptcy Code) have been cured or will be promptly cured by Seller so that Purchaser shall have no liability or obligation with respect to any default or obligation arising or accruing prior to the date of the Closing or in respect of any cure obligations, except as may otherwise be specifically agreed as set forth in this Agreement, and (iii) providing that the Assumed Contracts shall be transferred to, and remain in full force and effect for the benefit of, Purchaser, notwithstanding any provision in any such Assumed Contract or in applicable Law (including those described in Sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits, restricts, or limits in any way such assignment or transfer.

(e)     Other Bankruptcy Covenants.  Seller shall promptly make any filings, take all actions, and use its best efforts to obtain any and all other approvals and orders necessary or appropriate for consummation of the sale of the Assets, subject to its obligations to comply with any order of the Bankruptcy Court.  In the event an appeal is taken, or a stay pending appeal is requested, from any of the foregoing orders of the Bankruptcy Court, Seller shall immediately notify Purchaser of such appeal or stay request and, upon Purchaser's request, shall provide to Purchaser within two days after Seller's receipt thereof a copy of the related notice of appeal or order of stay.  Seller shall also provide Purchaser with written notice of any motion, application, brief or other pleading filed in connection with any appeal from any of such orders.

(f)     Settlement Order.  The Settlement Order shall be acceptable in form and substance to Purchaser, and shall include provisions, among other things, (i) allowing Purchaser's claim in the Bankruptcy Case in the amount of $2,350,000 and (ii) releasing Purchaser of any and all claims of Seller and its bankruptcy estate.

6.6     Apportioned Obligations.  All real property Taxes, personal property Taxes and similar ad valorem obligations levied with respect to the Assets for a taxable period which includes (but does not end on) the Closing Date (collectively, the "**Apportioned Obligations**") shall be apportioned between Seller and Purchaser based on the number of days of such taxable period included in the Pre-Closing Tax Period and the number of days of such taxable period included in the Post-Closing Tax Period.  The Seller shall be liable for the proportionate amount of such Taxes that is attributable to the Pre-Closing Tax Period, and

APA-Final-Clean-May-28-2008                 *EXHIBIT A*

# EXHIBIT 1
# Page 46

Purchaser shall be liable for the proportionate amount of such Taxes that is attributable to the Post-Closing Tax Period. Upon receipt of any bill for real or personal property taxes relating to the Assets, each of Seller and Purchaser shall present a statement to the other setting forth the amount of reimbursement to which each is entitled under this **Section 6.6** together with such supporting evidence as is reasonably necessary to calculate the proration amount. The proration amount shall be paid by the party owing it to the other within ten (10) Business Days after delivery of such statement. In the event that either Seller or Purchaser shall make any payment for which it is entitled to reimbursement under this **Section 6.6**, the other party shall make such reimbursement promptly but in no event later than ten (10) Business Days after the presentation of a statement setting forth the amount of reimbursement to which presenting party is entitled along with such supporting evidence as is reasonably necessary to calculate the amount of reimbursement. Purchaser shall notify Seller's Representative of any audit or examination of the Apportioned Obligations. The Seller's Representative shall have the right to participate in any such audit or examination and Purchaser shall not settle any such audit or examination without the consent of Seller's Representative, which consent shall not be unreasonably withheld.

## ARTICLE VII

### CONDITIONS TO CLOSING

7.1     Conditions Precedent to Obligations of Purchaser.     The obligation of Purchaser under this Agreement to consummate the transactions contemplated by this Agreement on the Closing Date shall be subject to the satisfaction, at or prior to the Closing Date, of all of the following conditions, any one or more of which may be waived by Purchaser:

(a)     Representations and Warranties Accurate.   The representations and warranties of Seller contained in this Agreement which are qualified as to materiality shall be true and correct in all respects, and those not so qualified shall be true and correct in all material respects, as of the date of this Agreement and as of the Closing Date with the same force and effect as though made on and as of the Closing Date.

(b)     Performance by Seller.   Seller shall have performed and complied in all material respects with all covenants and agreements required to be performed or complied with by such Person hereunder on or prior to the Closing Date.

(c)     Consents.  All Consents required in connection with the consummation of the transactions contemplated by this Agreement and the Closing (including those set forth on **Schedule 7.1(c)** hereto) shall have been duly obtained, made or given and shall be in full force and effect, without the imposition upon Purchaser or Seller of any condition, restriction or required undertaking.

(d)     No Legal Prohibition.   No suit, action, investigation, inquiry or other proceeding by any Governmental Entity or other Person shall have been instituted or threatened which arises out of or relates to this Agreement, or the transactions contemplated hereby and no injunction, order, decree or judgment shall have been issued and be in effect or threatened to be

APA-Final-Clean-May-25-2006                       *EXHIBIT A*

*Page 47*

# EXHIBIT 1
# Page 47

issued by any Governmental Entity of competent jurisdiction, and no statute, rule or regulation
shall have been enacted or promulgated by any Governmental Entity and be in effect, which in
each case restrains or prohibits the consummation of the transactions contemplated hereby.

(e)     Certificate. Purchaser shall have received a certificate, dated the Closing
Date, signed on behalf of Seller by an officer of Seller, to the effect that the conditions set forth
in Sections 7.1(a), 7.1(b), and 7.1(c) have been satisfied.

(f)     Completion of Disclosure Schedules. Seller shall have completed and
delivered the Disclose Schedules to Purchaser, and the Disclosure Schedules shall be acceptable
to Purchaser in its sole discretion.

(g)     No Material Adverse Change. No material adverse change shall have
occurred in the business of Seller and no other event, loss, damage, condition or state of facts of
any kind shall exist which has a Material Adverse Effect or can reasonably be expected to have a
Material Adverse Effect.

(h)     Additional Documents, etc. There shall have been delivered to Purchaser
each of the agreements, documents, certificates and other items set forth on Schedule 7.1(h) of
this Agreement.

(i)     Entry of Order; Appeal. The Bankruptcy Court shall have entered the Sale
Approval Order in accordance with Section 6.5(c), the Settlement Order in accordance with
Section 6.5(f), and any other order in accordance with Section 6.5(d) relating to the assignment
of the Assumed Contracts, all in form and substance reasonably acceptable to Purchaser, and the
Sale Approval Order, the Settlement Order, and any other order in accordance with Section
6.5(d) relating to the assignment of the Assumed Contracts, shall not have been stayed.

7.2     Conditions Precedent to Obligations of Seller. The obligations of Seller
under this Agreement to consummate the transactions contemplated by this Agreement on the
Closing Date shall be subject to the satisfaction, at or prior to the Closing Date, of all of the
following conditions, any one or more of which may be waived by Seller:

(a)     Representations and Warranties Accurate. The representations and
warranties of Purchaser contained in this Agreement which are qualified as to materiality shall be
true and correct in all respects, and those not so qualified shall be true and correct in all material
respects, as of the date of this Agreement and as of the Closing Date with the same force and
effect as though made on and as of the Closing Date.

(b)     Performance by Purchaser. Purchaser shall have performed and complied
in all material respects with all covenants and agreements required to be performed or complied
with by them hereunder on or prior to the Closing Date.

(c)     Consents. All Consents required in connection with the purchase and sale
of the Assets and the Closing shall have been duly obtained, made or given and shall be in full
force and effect.

*EXHIBIT A*

*Page 48*

# EXHIBIT 1
# Page 48

(d)     No Legal Prohibition.  No suit, action, investigation, inquiry or other proceeding by any Governmental Entity or other Person shall have been instituted or threatened which arises out of or relates to this Agreement or the transactions contemplated hereby and no injunction, order, decree or judgment shall have been issued and be in effect or threatened to be issued by any Governmental Entity of competent jurisdiction, and no statute, rule or regulation shall have been enacted or promulgated by any Governmental Entity and be in effect, which in each case restrains or prohibits the consummation of the transactions contemplated hereby.

(e)     Certificate.  Seller's Representative shall have received a certificate, dated the Closing Date, signed on behalf of Purchaser by an officer of Purchaser, to the effect that the conditions set forth in **Sections 7.2(a)**, **7.2(b)** and **7.2(c)** have been satisfied.

(f)     Additional Documents, etc.  There shall have been delivered to Seller's Representative each of the agreements, documents and other items set forth on **Schedule 7.(h)** of this Agreement to be delivered to Seller.

(g)     Entry of Order; Appeal.  The Sale Approval Order shall have been entered by the Bankruptcy Court and shall not have been stayed.

## ARTICLE VIII

### INDEMNIFICATION

8.1     Non-Survival of Representations and Warranties.  All representations and warranties contained in **Articles IV** and **V** shall expire at the close of business on the Closing Date.

## ARTICLE IX

### MISCELLANEOUS

9.1     Termination.  This Agreement may be terminated, and the transactions contemplated herein may be abandoned:

(a)     any time before the Closing, by mutual written agreement of Seller and Purchaser;

(b)     any time before the Closing, by Seller, on the one hand, or Purchaser, on the other hand, in the event of a material breach hereof by any non-terminating party if such non-terminating party fails to cure such breach within five (5) Business Days following notification thereof by the terminating party; or

APA-Final-Clean-May-25-2006                    *EXHIBIT A*

*Page 49*

# EXHIBIT 1
# Page 49

(c)     by Purchaser, upon five (5) Business Days' prior written notice to Seller's Representative, if through no fault of Purchaser (i) the Sale Approval Order and any other order in accordance with **Section 6.5(d)** relating to the assignment of the Assumed Contracts shall not have been entered by June 6, 2006 or (ii) the Closing has not taken place by the sixtieth (60th) day following the date hereof, other than by reason of a material breach of this Agreement by Purchaser.

    9.2    Effect of Termination.

    (a)     If this Agreement is validly terminated pursuant to **Section 9.1**, this Agreement will forthwith become null and void, and there will be no liability or obligation on the part of any party (or any of their respective officers, directors, employees, partners, agents or other representatives or Affiliates), except as provided in **Section 9.2(b)**.

    (b)     Notwithstanding the provisions of **Section 9.2(a)**, above:

        (i)     if Purchaser or Seller terminates this Agreement pursuant to **Section 9.1(a)**, Purchaser shall receive the prompt return of the Deposit;

        (ii)    if Purchaser terminates this Agreement pursuant to **Section 9.1(b)** or **Section 9.1(c)**, Purchaser shall receive the prompt return of the Deposit;

        (iii)   if Seller terminates this Agreement pursuant to **Section 9.1(b)**, Seller shall receive, as its sole and exclusive remedy available under any Law, including the Bankruptcy Code, the Deposit.

    9.3    Expenses.  Except as otherwise set forth herein, each party hereto shall pay its own expenses incurred in connection with this Agreement and the transactions contemplated hereby.

    9.4    Amendment.  This Agreement may not be modified, amended, altered or supplemented except by a written agreement executed by Purchaser and Seller.

    9.5    Entire Agreement.  This Agreement, together with the Exhibits and Schedules hereto and the instruments and other documents delivered pursuant to this Agreement, contain the entire agreement of the parties relating to the subject matter hereof, and supersede all prior agreements, understandings, representations, warranties and covenants of any kind between the parties.  All others are specifically waived.

APA-Final-Clean-May-25-2006                *EXHIBIT A*

9.6     Waivers.  Waiver by any party of any breach of or failure to comply with any provision of this Agreement by the other party shall not be construed as, or constitute, a continuing waiver of such provision, or a waiver of any other breach of, or failure to comply with, any other provision of this Agreement.  No waiver of any such breach or failure or of any term or condition of this Agreement shall be effective unless in a written notice signed by the waiving party and delivered, in the manner required for notices generally, to each affected party.

9.7     Notices.  All notices and other communications hereunder shall be validly given or made if in writing, (i) when delivered personally (by courier service or otherwise), (ii) when sent by telecopy, or (iii) when actually received if mailed by first-class certified or registered United States mail or recognized overnight courier service, postage-prepaid and return receipt requested, and all legal process with regard hereto shall be validly served when served in accordance with applicable law, in each case to the address of the party to receive such notice or other communication set forth below, or at such other address as any party hereto may from time to time advise the other parties pursuant to this Subsection:

If to Seller:

> ADVANCED BEAUTY SOLUTIONS LLC
> Jason Dodo, Managing Member
> 1807 10th Street #2
> Santa Monica, CA 90404
> Tel: 310-985-1540
> Fax: 310-868-2788

with a copy to:

> James C. Bastian, Jr., Esq.
> SHULMAN HODGES & BASTIAN LLP
> 26632 Towne Centre Drive , Suite 300
> Foothill Ranch, California 92610-2808
> Tel: 949-340-3400
> Fax: 949-340-3000

If to Purchaser:

> Iehab Hawatmeh
> CirTran Corporation
> 4125 South 6000 West
> West Valley City, Utah 84128
> Tel: 801-963-5112
> Fax: 801-963-8823

*EXHIBIT A*

# EXHIBIT 1
# Page 51

with a copy to:

> David Gould, Esq.
> McDermott Will & Emery LLP
> 2049 Century Park East
> Los Angeles, CA 90067
> Tel: 310-277-4110
> Fax: 310-277-4730

and

> James Sullivan, Esq.
> McDermott Will & Emery LLP
> 340 Madison Avenue
> New York, NY 10017
> Tel: 212-547-5477
> Fax: 212-547-5444

9.8    Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same document.

9.9    Governing Law. All disputes arising out of or related to this Agreement, including, without limitation, any dispute relating to the interpretation, meaning or effect of any provision hereof, will be resolved in the Bankruptcy Court and the parties hereto will each submit to the exclusive jurisdiction of the Bankruptcy Court for the purposes of adjudicating any such dispute, to the extent the jurisdiction of the Bankruptcy Court is applicable. If the jurisdiction of the Bankruptcy Court is not applicable, any legal action, suit or proceeding arising out of or relating to this Agreement, each and every agreement and instrument contemplated hereby or the transactions contemplated hereby and thereby shall be instituted in any Federal court of the Central District of California. This Agreement shall be governed by and construed in accordance with the internal laws of the State of California (i.e., without regard to its conflicts of law rules).

9.10    Binding Effect; Third Party Beneficiaries; Assignment. This Agreement shall be binding upon, inure to the benefit of, and be enforceable by, the parties hereto and their respective legal representatives, successors and permitted assigns. Except as expressly set forth herein, nothing expressed or referred to in this Agreement is intended or shall by construed to give any Person other than the parties to this Agreement, or their respective legal representatives, successors and permitted assigns, any legal or equitable right, remedy or claim under or in respect of this Agreement or any provision contained herein. Neither party may assign this Agreement nor any of its rights hereunder, other than any right to payment of a liquidated sum, nor delegate any of its obligations hereunder, without the prior written consent of the other, except that Purchaser may assign its rights under this Agreement to any Affiliate or to any Person providing financing for the transaction.

*EXHIBIT A*

*Page 52*

# EXHIBIT 1
# Page 52

9.11     Severability. Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall not invalidate the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction, and any such provision, to the extent invalid or unenforceable, shall be replaced by a valid and enforceable provision which comes closest to the intention of the parties underlying such invalid or unenforceable provision.

9.12     Specific Performance. Notwithstanding anything to the contrary contained herein, each party hereto acknowledges that money damages would be incalculable and an insufficient remedy for any breach of this Agreement by such party and that any such breach would cause the other party hereto irreparable harm. Accordingly, each party hereto also agrees that, in the event of any breach or threatened breach of the provisions of this Agreement by such party, the other party hereto shall be entitled to equitable relief without the requirement of posting a bond or other security, including in the form of injunctions and orders for specific performance.

9.13     Headings. The headings contained in this Agreement are for reference purposes only and shall not modify define, limit, expand or otherwise affect in any way the meaning or interpretation of this Agreement.

9.14     No Agency. Except as provided in **Section 9.15** hereof, no party hereto shall be deemed hereunder to be an agent of, or partner or joint venturer with, any other party hereto.

9.15     Seller's Representative. Seller hereby irrevocably appoints Jason Dodo (herein called the "**Seller's Representative**") as its true and lawful attorney-in-fact and agent, with full power of substitution or resubstitution, to act solely and exclusively on behalf of Seller with respect to any matters relating to this Agreement and any document, certificate or other agreement to be executed and delivered by or on behalf of Seller pursuant hereto, with the full power, without the consent of Seller, to exercise as it in its sole discretion deems appropriate, all of the powers which Seller could exercise under the provisions of this Agreement or any document, certificate or other agreement to be executed and delivered by or on behalf of Seller pursuant hereto, including, without limitation, to (i) accept and give notices hereunder or thereunder on behalf of Seller, (ii) consent to any modification or amendment hereof or thereof or (iii) give any waiver or consent hereunder or thereunder. Seller's Representative does hereby accept such appointment. Purchaser shall be entitled to rely exclusively upon such notices, waivers, consents, amendments, modifications and other acts of Seller's Representative as being the binding acts of Seller, and Purchaser shall be entitled to deliver any notices, payments or other items required to be delivered by it to Seller hereunder or thereunder only to Seller's Representative, and any such delivery shall be fully effective as if it were made directly to Seller. Seller's Representative shall not effect any substitution for himself as Seller's Representative without the prior written consent of Purchaser, which consent shall not be unreasonably withheld.

*EXHIBIT A*

                                                                                                    *Page 53*

# EXHIBIT 1
# Page 53

— Part 2

9.16    Knowledge Qualifications; Accounting Terms.    (a)    Whenever any party makes any representation, warranty or other statement to such party's knowledge, such party will be deemed to have made due inquiry into the subject matter of such representation, warranty or other statement, including due inquiry of each officer and director of such party as well as any other person who has responsibility with respect to the relevant subject matter.

(b)    Any accounting terms used in this Agreement shall, unless otherwise defined in this Agreement, have the meaning ascribed thereto by GAAP.

9.17    Interpretation.    In this Agreement, unless a contrary intention appears, (i) the words "herein", "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section or other subdivision, and to any certificates delivered pursuant hereto; and (ii) reference to any Article or Section means such Article or Section hereof.

.

*EXHIBIT A*

*Page 54*

# EXHIBIT 1
# Page 54

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

**ADVANCED BEAUTY SOLUTIONS, LLC**

By: _____
        Name:
        Title:


**CIRTRAN CORPORATION**

By: _____
        Name:
        Title:

*EXHIBIT A*

IN WITNESS WHEREOF, the parties have executed this Agreement as of the
date first above written.

ADVANCED BEAUTY SOLUTIONS, LLC

By:
    Name: Jason Oele
    Title: CEO

CIRTRAN CORPORATION

By:
    Name:
    Title:

*Page 56*

**EXHIBIT 1**
**Page 56**

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

**ADVANCED BEAUTY SOLUTIONS, LLC**

By: _____
       Name:
       Title:

**CIRTRAN CORPORATION**

By: _____
       Name: IEHAB   HAWATMEH
       Title: PRESIDENT / CEO

*Page 57*

*EXHIBIT A*

# EXHIBIT 1
# Page 57

**Exhibit 1**

Disclosure Schedule

Unless otherwise noted, capitalized terms in these Exhibits and Disclosure Schedules shall have the meaning as set forth in the Asset Purchase Agreement. References to Seller's Bankruptcy Schedules means the Bankruptcy Schedules filed in Seller's bankruptcy case pending in the Central District of California, San Fernando Valley Division entitled In re Advanced Beauty Solutions, LLC, Case No. SV 06-10076 GM and any and all amendments to the Bankruptcy Schedules.

*EXHIBIT A*

G:\Wp\Cases\A-B\Advanced-Beauty\Cirtran\APA-Schedules-Exhibits-Schedules-Cover-004-C]n doc
3495-000

*Page 58*

# EXHIBIT 1
# Page 58

**Exhibit 2**

Sale Approval Order

To be provided once entered by the Bankruptcy Court.

*EXHIBIT A*

G:\Wp\Cases\A-B\Advanced-Beauty\Curran\APA-Schedules-Exhibits-Schedules-Cover-004-Cln.doc

3495-000

*Page 59*

**EXHIBIT 1**

**Page 59**

**Exhibit 3**

Bill of Sale Form

*EXHIBIT A*

G:\Wp\Cases\A-B\Advanced-Beauty\Curran\APA-Schedules-Exhibits-Schedules-Cover-004-Cln.doc
3495-000

# EXHIBIT 1

# Page 60

## BILL OF SALE

**THIS BILL OF SALE** (this "**Bill of Sale**") is made as of this ____ day of
_____, 2006, by Advanced Beauty Solutions, LLC, a California limited liability
company, the debtor and debtor in possession in the Chapter 11 Bankruptcy Case of In re
Advanced Beauty Solutions, LLC, Case No. SV 06-10076 GM (the "Seller "), pursuant to
the Order Pursuant to Sections 105, 363, 365 and 1146 of the Bankruptcy Code: (A)
Approving the Terms and Conditions of an Agreement for the Sale of Substantially All
Assets of the Debtor And the Assumption and Assignment of Related Executory
Contracts and Unexpired Leases; (B) Authorizing the Consummation of the Transactions
Contemplated Therein; and (C) Granting Related Relief entered by the Bankruptcy Court
on _____, 2006 (the "**Sale Order**"), in favor of CirTran Corporation, a Nevada
corporation ("Purchaser"). Unless otherwise defined herein, capitalized terms shall be
used herein as defined in the Asset Purchase Agreement (as such term is defined below).

### W I T N E S S E T H:

**WHEREAS**, pursuant to the Sale Order, Seller and Purchaser are parties to an
Asset Purchase Agreement, dated as of _____, 2006 (the "**Asset Purchase
Agreement**"), pursuant to which Purchaser is purchasing substantially all of Seller's
assets subject to the terms of the Sale Order; and

**WHEREAS**, the execution and delivery of this Bill of Sale by Seller is a
condition to the obligations of Purchaser to consummate the transactions contemplated by
the Asset Purchase Agreement subject to the terms of the Sale Order.

**NOW, THEREFORE**, for good and valuable consideration, receipt of which is
hereby acknowledged, and pursuant to the Asset Purchase Agreement and the Sale Order,
Seller, intending to be legally bound hereby, hereby agrees as follows:

1.     Conveyance of Purchased Assets. Subject to the terms of the Sale Order
and the Asset Purchase Agreement, Seller hereby sells, transfers, conveys, assigns and
delivers to Purchaser, its successors and assigns, to have and to hold forever, all right,
title and interest in, to and under all of the Assets. Notwithstanding anything in this Bill
of Sale or the Asset Purchase Agreement to the contrary, it is understood that none of the
Excluded Assets are being transferred or assigned to Purchaser. Seller warrants that,
upon delivery to Purchaser of the Assets sold, assigned, transferred, conveyed, granted,
bargained, set over, released, delivered, vested and confirmed from Seller to Purchaser
pursuant to this Bill of Sale, Purchaser will own, with good and marketable title and free
and clear of all Encumbrances, the Assets.

2.     Obligations and Liabilities Not Assumed. Nothing expressed or implied
in this Bill of Sale shall be deemed to be an assumption by Purchaser of any liabilities of
Seller. Purchaser does not by this Bill of Sale assume or agree to pay, perform or
discharge any liabilities of Seller of any nature, kind or description whatsoever.

### *EXHIBIT A*

G:\Wp\Cases\A-B\Advanced-Beauty\Cirtran\APA-Schedules-Exhibits-Schedules-Cover-004-Cin.doc
3495-000

*Page 61*

# EXHIBIT 1
# Page 61

3.    No Third Party Beneficiaries.  This Bill of Sale shall be binding upon and inure solely to the benefit of the parties hereto and their permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other person any legal or equitable right, benefit or remedy of any nature whatsoever, under or by reason of this Bill of Sale.

4.    Binding Nature.  This Bill of Sale shall be binding upon and inure to the benefit of the parties hereto without limitation, and their successors and assigns.

5.    Counterparts.  This Bill of Sale may be executed in several counterparts, each of which shall be deemed an original, and all such counterparts shall constitute one and the same instrument.

6.    Governing Law.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of California, applicable to contracts executed in and to be performed entirely within that state..

**[Remainder of Page Intentionally Left Blank]**

*EXHIBIT A*

gmentation.

Case 1:08-ap-01363-GM   Doc 54   Filed 07/20/09   Entered 07/20/09 18:15:01   Desc
Main Document    Page 67 of 120

signor

ADVANCED BEAUTY SOLUTIONS, LLC


By:_____
Its: _____


ACKNOWLEDGED AND AGREED:

CIRTRAN CORPORATION

By:_____
Name:
Title:

*EXHIBIT A*

G:\Wp\Cases\A-B\Advanced-Beauty\Cirtran\APA-Schedules-Exhibits-Schedules-Cover-004-Cln.doc
3495-000

*Page 63*

**EXHIBIT 1**
**Page 63**

**Exhibit 4**

Assignment of Real Property Leases

None – No Real Property Leases To Be Assigned.

*EXHIBIT A*

G:\Wp\Cases\A-B\Advanced-Beauty\Cirtran\APA-Schedules-Exhibits-Schedules-Cover-004-Cln.doc
3495-000

*Page 64*

**EXHIBIT 1**
**Page 64**

**Exhibit 5**

General Assignment

.

*EXHIBIT A*

G:\Wp\Cases\A-B\Advanced-Beauty\Curran\APA-Schedules-Exhibits-Schedules-Cover-004-Clo.doc
3405-000

*Page 65*

**EXHIBIT 1**
**Page 65**

## GENERAL GRANT AND ASSIGNMENT

FOR VALUE RECEIVED, ADVANCED BEAUTY SOLUTIONS, LLC, a California limited liability company ("Seller") hereby hereby unconditionally and irrevocably assigns and transfers unto CIRTRAN CORPORATION, a Nevada corporation ("Purchaser") all of Seller's right, title, and interest in and to the Assets described in the Asset Purchase Agreement dated as of May ___, 2006 by and between the Seller and the Purchaser subject to the terms and conditions of that certain Order Pursuant to Sections 105, 363, 365 and 1146 of the Bankruptcy Code:  (A)  Approving the Terms and Conditions of an Agreement for the Sale of Substantially All Assets of the Debtor And the Assumption and Assignment of Related Executory Contracts and Unexpired Leases; (B) Authorizing the Consummation of the Transactions Contemplated  Therein; and (C) Granting Related Relief entered by the Bankruptcy Court on _____, 2006 (the "Sale Order").  The undersigned fully warrants that it has full rights and authority to enter into this Assignment subject to the terms of the Sale Order and that the rights and benefits assigned hereunder are free and clear of any lien, encumbrance, adverse claim or interest by any third party.

The assignment shall be binding upon and inure to the benefit of the parties, and their successors and assigns.

AGREED TO AND ACCEPTED as of May ___, 2006.

Assignor

ADVANCED BEAUTY SOLUTIONS, LLC

By: _____
Its: _____

Assignee

CIRTRAN CORPORATION

By: _____
Its: _____

### *EXHIBIT A*

G:\Wp\Cases\A-B\Advanced-Beauty\Cirtran\APA-Schedules-Exhibits-Schedules-Cover-004-Cln.doc
3495-006

# EXHIBIT 1
# Page 66

**Exhibit 6**

Assignment of Seller Rights

Trademark Assignment
Copyright Assignment
Patent Assignment

*EXHIBIT A*

G:\Wp\Cases\A-B\Advanced-Beauty\Cirman\APA-Schedules-Exhibits-Schedules-Cover-004-Cln.doc
3495-000

## TRADEMARK ASSIGNMENT

WHEREAS, ADVANCED BEAUTY SOLUTIONS, LLC (the "Assignor"), a California limited liability company, is using certain trademarks in conjunction with its business, including but not limited to the trademarks and registrations thereof set forth in Schedule A attached hereto (all hereinafter collectively referred to as the "Trademarks");

WHEREAS, CIRTRAN CORPORATION (the "Assignee"), a Nevada corporation, is desirous of acquiring the entire right, title and interest in and to said Trademarks, including the right to bring actions for infringement of said Trademarks occurring prior to the date of this Assignment; and

WHEREAS, Assignor wishes to herein memorialize said assignment, transfer and sale of the Trademarks to Assignee.

NOW, THEREFORE, TO ALL WHOM IT MAY CONCERN, be it known that for good and valuable consideration set forth in the Asset Purchase Agreement entered into between Assignor and Assignee as of June __, 2006, the receipt and legal sufficiency of which is hereby acknowledged, subject to the terms of that certain Order Pursuant to Sections 105, 363, 365 and 1146 of the Bankruptcy Code: (A) Approving the Terms and Conditions of an Agreement for the Sale of Substantially All Assets of the Debtor And the Assumption and Assignment of Related Executory Contracts and Unexpired Leases;  (B) Authorizing the Consummation of the Transactions Contemplated Therein; and (C) Granting Related Relief entered by the Bankruptcy Court on _____, 2006 (the "Sale Order"), the Assignor has sold, assigned and transferred, and by these presents does sell, assign and transfer unto the Assignee, the entire right, title and interest in and to the Trademarks, and in and to all of the goodwill of the business appurtenant thereto, together with all claims for damages by reason of past or current infringement of same, with the right to sue for and collect the same for its own use and enjoyment, and for the use and enjoyment of its successors, assigns or other legal representatives.

AND, the Assignor hereby requests the United States Commissioner of Patents and Trademarks (the "Commissioner"), as well as his or her foreign counterparts in the foreign jurisdictions which exercise authority over any of the Trademarks to record this Trademark Assignment. The Assignor hereby further requests the Commissioner and his or her foreign counterparts to issue any and all registrations resulting from applications to register the Trademarks resulting from applications among the Trademarks or derived therefrom to Assignee as assignee of the entire interest.

AND, the Assignor hereby warrants and covenants that pursuant to the Sale Order, it has full right to convey the entire interest herein assigned, and that the Assignor has not executed, and will not execute, any agreement inconsistent herewith.

AND, the Assignor, for itself and its successors and assigns, hereby covenants and agrees that at any time and from time to time forthwith upon the request of the Assignee, the Assignor will, at its expense, do, execute, acknowledge and deliver or cause to be done, executed, acknowledged and delivered, all such further acts, deeds, instruments, transfers and assurances as may be reasonably required by the Assignee in order to assign, transfer, set over and convey unto, and vest in, the Assignee, its respective successors and assigns, any and all of

# EXHIBIT 1
# Page 68

the Trademarks, and to put the Assignee in actual possession and operating control thereof, to assist the Assignee in exercising all rights with respect thereto and to assure the Assignee of the full benefits thereof.

AND, the Assignor hereby constitutes and appoints the Assignee and its successors and assigns as its true and lawful attorneys in fact in connection with the transactions contemplated by this instrument, with full power of substitution to demand and receive, in the name and stead of the Assignor but on behalf of and for the benefit of the Assignee and its successors and assigns, any and all of the assets, properties, rights and business hereby conveyed, assigned, and transferred or intended so to be, and to give receipt and releases for and in respect of the same and any part thereof, and from time to time to institute and prosecute, in the name of the Assignor or otherwise, for the benefit of the Assignee or its successors and assigns, proceedings at law, in equity, or otherwise, which the Assignee or its successors or assigns deem proper in order to collect or reduce to possession or endorse any of the Trademarks, and to do all acts and things in relation to such assets which the Assignee or its successors or assigns reasonably deem desirable.

In the event that any provision of this Agreement would, under applicable law, be invalid or unenforceable in any respect, such provision shall be construed by modifying or limiting it so as to be valid and enforceable to the maximum extent compatible with, and possible under, applicable law. Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending item or provision in any other situation or in any other jurisdiction.

This Agreement shall be binding upon and shall inure to the benefit of the respective successors and permitted assigns of the Assignor and the Assignee. This Agreement shall not confer any rights or remedies upon any person other than the parties hereto, and their respective successors and permitted assigns.

This Agreement shall be governed by and construed in accordance with the domestic laws of the State of California without giving effect to any choice or conflict of law.

# EXHIBIT 1
# Page 69

IN TESTIMONY WHEREOF, the Assignor has caused this Assignment to be executed by its duly authorized representative on June _____, 2006.

ADVANCED BEAUTY SOLUTIONS, LLC

By:_____
Name:
Title:

CIRTRAN CORPORATION

By:_____
Name:
Title:

G.\Wp\Cases\A-B\Advanced-Beauty\Cirtran\APA-Schedules-Exhibts-Assignment-Cln.DOC
3495-000

*EXHIBIT 1*

*Page 70*

**EXHIBIT 1**
**Page 70**

## CERTIFICATE OF ACKNOWLEDGEMENT

STATE OF _____)
                         )SS.
COUNTY OF _____)

       I, _____, a Notary Public in and for the County and State aforesaid, do hereby certify that _____, personally known to me to be the same person(s) whose name(s) is (are) subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that they signed, sealed and delivered the said instrument as a free act and deed on behalf of the identified company, ADVANCED BEAUTY SOLUTIONS, LLC, a California limited liability company, with authority to do so.

       IN WITNESS WHEREOF, I have hereunto set my hand and Notarial Seal, this _____ day of _____, 2006.

 

                             _____
                             Notary Public

                             Commission Expires: _____

STATE OF _____)
                         )SS.
COUNTY OF _____)

       I, _____, a Notary Public in and for the County and State aforesaid, do hereby certify that _____, personally known to me to be the same person(s) whose name(s) is (are) subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that they signed, sealed and delivered the said instrument as a free act and deed on behalf of the identified corporation, CIRTRAN CORPORATION, a Nevada corporation, with authority to do so.

       IN WITNESS WHEREOF, I have hereunto set my hand and Notarial Seal, this _____ day of _____, 2006.

                             _____
                             Notary Public

                             Commission Expires: _____

G:\Wp\Cases\A-B\Advanced-Beauty\Cirtran\APA-Schedules-Exhibit-5-Personal-Premium-Ca-Cln.DOC
3495-000

*EXHIBIT A*

*Page 71*

# EXHIBIT 1
# Page 71

## SCHEDULE A TO TRADEMARK ASSIGNMENT

## TRADEMARK REGISTRATIONS

| Country | Mark | Date Filed | Date Registered | Serial/Registration Number |
|---------|------|-----------|-----------------|----------------------------|
| United States | True Ceramic Pro | 4-9-2004 | n/a | 78/399698 |
| International | True Ceramic Pro | 10-13-2004 | 10-13-2004 | 0861761 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**EXHIBIT 1**
**Page 72**

## COPYRIGHT ASSIGNMENT

For good and sufficient consideration, receipt of which is hereby acknowledged, ADVANCED BEAUTY SOLUTIONS, LLC, a California limited liability company ("Assignor") subject to the terms of that certain Order Pursuant to Sections 105, 363, 365 and 1146 of the Bankruptcy Code: (A) Approving the Terms and Conditions of an Agreement for the Sale of Substantially All Assets of the Debtor And the Assumption and Assignment of Related Executory Contracts and Unexpired Leases; (B) Authorizing the Consummation of the Transactions Contemplated Therein; and (C) Granting Related Relief entered by the Bankruptcy Court on _____, 2006 (the "Sale Order"), hereby sells, assigns, transfers, and quitclaims to CIRTRAN CORPORATION, a Nevada corporation ("Assignee"), all Assignor's right, title and interest of every kind and nature in and to all copyrights and author's rights, whether published or unpublished, including rights to prepare, reproduce and distribute copies, compilations, and derivative works, and all copyright licenses and copyright interests of every kind and nature, and any and all renewals and extensions thereof that may be secured under all laws now or hereafter in force and any and all causes of action heretofore accrued in Assignor's favor for infringement of such copyrights, author's rights, copyright licenses and copyright interests, and any and all copyright registrations therefor, whether currently in force or obtained hereafter, including but not limited to, all copyrights listed on Schedule A hereto, which are owned, possessed and/or controlled by Assignor, in all countries throughout the world wherein Assignor owns, possesses or controls the rights herein being transferred to Assignee, to the full extent of such rights.

At any time and from time to time hereafter, at Assignee's request, Assignor shall take any and all steps and execute, acknowledge and deliver to Assignee any and all future instruments and assurances necessary or expedient in order to vest the aforesaid copyrights, author's rights, copyright licenses and copyright interests more effectively in Assignee.

Assignor hereby constitutes and appoints Assignee, its true and lawful attorney-in-fact, with full power of substitution in Assignor's name and stead but for Assignee's benefit to take any and all steps including proceedings at law, in equity or otherwise, and to execute, acknowledge and deliver any and all instruments and assurances necessary or expedient in order to vest the aforesaid copyrights, author's rights, copyright licenses and copyright interests and causes of action more effectively in Assignee or to protect the same, or to enforce any claim or right of any kind with respect thereto (at Assignor's cost and expense).

*EXHIBIT A*
G:\Wp\Cases\A-B\Advanced-Beauty\Cirtran\APA-Schedules-Exhibit-6-Copyright-Assignment-Cln.DOC
3495-000

*Page 73*

# EXHIBIT 1
# Page 73

IN WITNESS WHEREOF, Assignor has caused this Assignment to be signed in its corporate name by its duly authorized officer, this ___ day of _____, 2006.

ADVANCED BEAUTY SOLUTIONS, LLC

By:_____
Name:
Title:

CIRTRAN CORPORATION

By:_____
Name:
Title:

G:\Wp\Cases\A-B\Advanced-Beauty\Cirtran\APA-Schedules-Exhibit-C-Copyright-Assignment-Cla.DOC
3495-000

*EXHIBIT A*

*Page 74*

EXHIBIT 1
Page 74

## CERTIFICATE OF ACKNOWLEDGEMENT

STATE OF _____ )
                        )SS.
COUNTY OF _____ )

    I, _____, a Notary Public in and for the County and State aforesaid, do hereby certify that _____, personally known to me to be the same person(s) whose name(s) is (are) subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that they signed, sealed and delivered the said instrument as a free act and deed on behalf of the identified company, ADVANCED BEAUTY SOLUTIONS, LLC, a California limited liability company, with authority to do so.

    IN WITNESS WHEREOF, I have hereunto set my hand and Notarial Seal, this _____ day of _____ _____, 2006.

_____
Notary Public

Commission Expires: _____

STATE OF _____ )
                        )SS.
COUNTY OF _____ )

    I, _____, a Notary Public in and for the County and State aforesaid, do hereby certify that _____, personally known to me to be the same person(s) whose name(s) is (are) subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that they signed, sealed and delivered the said instrument as a free act and deed on behalf of the identified corporation, CIRTRAN CORPORATION, a Nevada corporation, with authority to do so.

    IN WITNESS WHEREOF, I have hereunto set my hand and Notarial Seal, this _____ day of _____, 2006.

_____
Notary Public

Commission Expires: _____

G:\Wp\Cases\A-B\Advanced Beauty\Cirtran\APA-Schedules-Exhibit-6-Copyright-Assignment-C'ln.DOC
3495-000

*EXHIBIT A*

*Page 75*

# EXHIBIT 1
# Page 75

## SCHEDULE A TO COPYRIGHT ASSIGNMENT

### COPYRIGHT REGISTRATIONS

| NAME OF WORK | REGISTRATION NO. | REGISTRATION DATE |
|---|---|---|
| Advanced Beauty Solutions website and web pages | TX-6-064-955 | 10-4-2004 |
| Advanced Beauty Solutions brochure and literature | TX-6-064-956 | 10-4-2004 |
| True Ceramic Pro – Live Ops (TCP5) infomercial and related master tapes | n/a | n/a |

*EXHIBIT A*
G:\Wp\Cases\A-B\Advanced-Beauty\Cirman\APA-Schedules-Exhibits-Copyright-Assignment-Cln.DOC
3495-000

*Page 76*

# EXHIBIT 1
# Page 76

## PATENT ASSIGNMENT

WHEREAS, ADVANCED BEAUTY SOLUTIONS, LLC, a California limited liability company ("Assignor"), subject to the terms of that certain Order Pursuant to Sections 105, 363, 365 and 1146 of the Bankruptcy Code: (A) Approving the Terms and Conditions of an Agreement for the Sale of Substantially All Assets of the Debtor And the Assumption and Assignment of Related Executory Contracts and Unexpired Leases; (B) Authorizing the Consummation of the Transactions Contemplated Therein; and (C) Granting Related Relief entered by the Bankruptcy Court on _____, 2006 (the "Sale Order"), hereby sells, assigns, transfers, and quitclaims to CIRTRAN CORPORATION, a Nevada corporation ("Assignee"), all Assignor's right, title and interest in and to the inventions, patents, patent applications, and any continuations, continuations-in-part, divisions, reissues, reexaminations, extensions, and foreign patents and patent applications thereof (collectively, the "Patent Applications"), and any rights to file applications and receive patents thereon, the same to be held and enjoyed by Assignee for its own use and enjoyment, and for the use and enjoyment of its successors, assigns or other legal representatives, to the end of the term or terms for which the said Patent Applications are or may be granted or reissued, as fully and entirely as the same would have been held and enjoyed by Assignor if this assignment and sale had not been made, including but not limited to, all inventions listed on Schedule A hereto, together with all claims for past and future damages by reason of infringement of same, with the right to sue for past and future damages and collect the same for its own use and enjoyment, and for the use and enjoyment of its successors, assigns or other legal representatives.

AND, Assignor hereby requests the United States Commissioner of Patents and Trademarks (the "Commissioner"), as well as his or her foreign counterparts in the foreign jurisdictions which exercise authority over any of the Patent Applications to record this Patent Assignment. Assignor hereby further requests the Commissioner and his or her foreign counterparts to issue any and all patents resulting from applications among the Patent Applications or derived therefrom to Assignee as assignee of the entire interest.

AND, Assignor hereby warrants and covenants that subject to the terms of the Sale Order, it has full right to convey the entire interest herein assigned, and that Assignor has not executed, and will not execute, any agreement inconsistent herewith.

AND, Assignor, for itself and its successors and assigns, hereby covenants and agrees that at any time and from time to time forthwith upon the request of Assignee, Assignor will, at Assignee's expense, do, execute, acknowledge and deliver or cause to be done, executed, acknowledged and delivered, all such further acts, deeds, instruments, transfers and assurances as may be reasonably required by Assignee in order to assign, transfer, set over and convey unto, and vest in, Assignee, its respective successors and assigns, any or all of the Patent Applications, and to put Assignee in actual possession and operating control thereof, free and clear of all liens, to assist Assignee in exercising all rights with respect thereto and to assure Assignee of the full benefits thereof.

G:\Wp\Cases\A-B\Advanced-Beauty'Cirtran\APA-Schedules-Exhibit-6-Patent-Assignment-Cln DOC
3495-000

*EXHIBIT A*

*Page 77*

# EXHIBIT 1
# Page 77

AND, Assignor hereby constitutes and appoints Assignee and its successors and assigns as its true and lawful attorneys in fact in connection with the transactions contemplated by this instrument, with full power of substitution to demand and receive, in the name and stead of Assignor but on behalf of and for the benefit of Assignee and its successors and assigns, any and all of the assets, properties, rights and business hereby conveyed, assigned, and transferred or intended so to be, and to give receipt and releases for and in respect of the same and any part thereof, and from time to time to institute and prosecute, in the name of Assignor or otherwise, for the benefit of Assignee or its successors and assigns, proceedings at law, in equity, or otherwise, which Assignee or its successors or assigns deem proper in order to collect or reduce to possession or endorse any of the Patent Applications, and to do all acts and things in relation to such assets which Assignee or its successors or assigns reasonably deem desirable.

In the event that any provision of this Agreement would, under applicable law, be invalid or unenforceable in any respect, such provision shall be construed by modifying or limiting it so as to be valid and enforceable to the maximum extent compatible with, and possible under, applicable law. Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending item or provision in any other situation or in any other jurisdiction.

This Agreement shall be binding upon and shall inure to the benefit of the respective successors and permitted assigns of Assignor and Assignee. This Agreement shall not confer any rights or remedies upon any person other than the parties hereto, and their respective successors and permitted assigns.

# EXHIBIT 1
# Page 78

This Agreement shall be governed by and construed in accordance with the domestic laws of the State of California giving effect to any choice or conflict of law.

IN TESTIMONY WHEREOF, Assignor has caused this Assignment to be executed by its duly authorized representative on June ___, 2006.

ADVANCED BEAUTY SOLUTIONS, LLC

By:_____ _____
Name:
Title:

CIRTRAN CORPORATION

By:_____
Name:
Title:

*EXHIBIT A*

*Page 79*

**EXHIBIT 1**
**Page 79**

## CERTIFICATE OF ACKNOWLEDGEMENT

STATE OF _____ )
_____ )SS.
COUNTY OF _____ )

       I, _____, a Notary Public in and for the County and State aforesaid, do hereby certify that _____, personally known to me to be the same person(s) whose name(s) is (are) subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that they signed, sealed and delivered the said instrument as a free act and deed on behalf of the identified company, ADVANCED BEAUTY SOLUTIONS, LLC, a California limited liability company, with authority to do so.

       IN WITNESS WHEREOF, I have hereunto set my hand and Notarial Seal, this _____ day of _____, 2006.

 

_____
Notary Public

Commission Expires: _____

STATE OF _____ )
_____ )SS.
COUNTY OF _____ )

       I, _____, a Notary Public in and for the County and State aforesaid, do hereby certify that _____, personally known to me to be the same person(s) whose name(s) is (are) subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that they signed, sealed and delivered the said instrument as a free act and deed on behalf of the identified corporation, CIRTRAN CORPORATION, a Nevada corporation, with authority to do so.

       IN WITNESS WHEREOF, I have hereunto set my hand and Notarial Seal, this _____ day of _____, 2006.

 

_____
Notary Public

Commission Expires: _____

# EXHIBIT 1
# Page 80

SCHEDULE A
TO
PATENT TRANSFER AND ASSIGNMENT

| Country | Title | Date Filed/ National Phase Entered | Patent/Application Number |
|---------|-------|-----------------------------------|---------------------------|
| n/a | True Ceramic Pro | n/a | n/a |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

*EXHIBIT A*

**EXHIBIT 1**
**Page 81**

**Exhibit 7**

Undertaking Form

Not Applicable.  **Schedule 2.1(a)**

List of Personal Property Owned by Seller to be Sold to Purchaser

Seller owns miscellaneous office equipment, furnishings and supplies valued in its
Bankruptcy Schedules at approximately $1,500 which is not included in the Assets to be
sold to Purchaser.  No personal property to be to be sold, transferred, assigned, or
conveyed to the Purchaser under the Asset Purchase Agreement.

*EXHIBIT A*

G:\Wp\Cases\A-B\Advanced-Beauty\Cmran\APA-Schedules-Exhibits-Schedules-Cover-004-Cln doc
3495-000

*Page 82*

**EXHIBIT 1**
**Page 82**

**Schedule 2.1(c)(i)**

Contracts to be Assumed

None – no contracts to be assumed.

*EXHIBIT A*

### Schedule 2.1(c)(ii)

Contracts or leases to which Seller is or was a party that are not capable of being assumed
and/or assigned under Section 365 of the Bankruptcy Code

None. -- no contracts to be assumed.

*EXHIBIT A*

G:\Wp\Cases\A-B\Advanced-Beauty\Cirtran\APA-Schedules-Exhibits-Schedules-Cover-004-Cln.doc
3495-000

*Page 84*

# EXHIBIT 1
# Page 84

**Schedule 2.1(d)**

Inventory

*EXHIBIT A*

G:\Wp\Cases\A-B\Advanced-Beauty\Cirtran\APA-Schedules-Exhibits-Schedules-Cover-004-Cln.doc
3495-000

*Page 85*

# EXHIBIT 1
# Page 85

Actual Inventory Schedule

| INVENTORY PURCHASE |
|---|

| | Sku | Cost | Count | Value |
|---|---|---|---|---|
| IRONS | Iron | $16.95 | 137 | $2,322 |
| | Basic Kit | $24.46 | 75 | $1,835 |
| | Deluxe Kit | $31.47 | 30 | $944 |
| | VHS Kit | $24.24 | 311 | $7,539 |
| | Iron | $19.00 | 0 | $    - |
| | | | | |
| COMPONENTS | Kit - Assembled (No Iron) | $3.45 | 9,306 | $32,106 |
| | Retail Box - Basic | $0.95 | 40,000 | $38,000 |
| | Retail Box - Deluxe | $1.39 | 12,000 | $16,680 |
| | Bag | $2.30 | 1,666 | $3,832 |
| | Comb | $0.22 | 850 | $187 |
| | Clips | $1.70 | 3,870 | $6,579 |
| | Brush | $1.50 | 5,474 | $8,211 |
| | Instructional VHS | $1.35 | 1,246 | $1,682 |
| | Instructional DVD | $0.57 | 3,840 | $2,189 |
| | | | | |
| WET GOODS | Shine Spray 2 oz | $1.03 | 10,404 | $10,716 |
| | Thermal Styler 2oz | $1.04 | 29,295 | $30,467 |
| | Shine Spray & Thermal Combo | $2.07 | | $    - |
| | Daily Conditioner - 2 oz | $1.05 | 5,978 | $6,277 |
| | Weekend Shampoo - 2 oz | $1.31 | 4,056 | $5,313 |
| | Daily Shampoo - 12 oz | $1.65 | 72 | $119 |
| | Daily Conditioner - 12 oz | $1.96 | 1,282 | $2,513 |
| | Weekend Shampoo - 6 oz | $1.95 | 72 | $140 |
| | Weekend Conditioner - 6 oz | $2.52 | 2,184 | $5,504 |
| | Leave-In Conditioner - 8oz | $1.76 | 4,392 | $7,730 |
| | Thermal Styler – 6oz | $1.79 | 983 | $1,760 |
| | Weekend Conditioner - 6 oz | $1.66 | 12,273 | $20,373 |
| | Thermal Active Straightener | $1.38 | 19,476 | $26,877 |
| | Kits - Deluxe Upsells | $9.05 | 1,584 | $14,335 |
| | Kits - Basic - Continuity | $3.38 | 1,590 | $5,374 |
| | Kits - Deluxe – Continuity | $9.20 | 1,465 | $13,478 |
| | | | | |
| | | | 173,911 | 273,081 |

*EXHIBIT A*

**Schedule 2.1(f)**

Deposits and Prepaid Expenses

None

Seller is <u>not</u> transferring any deposits and/or prepaid expenses on hand or held by Seller in any and all banks, brokerages, or other accounts and any and all deposits with public utilities, telephone companies, landlords, taxing agencies and others, including but not limited to those listed in Seller's Bankruptcy Schedules.

*EXHIBIT A*

**Section 2.1(i)**

Causes of Action to be Assigned

None

No causes of action of the Seller are to be assigned to the Purchaser.

*EXHIBIT A*
G:\Wp\Cases\A-B\Advanced-Beauty\Curtzan\APA-Schedules-Exhibits-Schedules-Cover-004-Cln.doc
3495-000

*Page 88*

**EXHIBIT 1**
**Page 88**

**Schedule 2.1(j)**

Permits.

None..

*EXHIBIT A*

G:\Wp\Cases\A-B\Advanced-Beauty\Curtran\APA-Schedules-Exhibits-Schedules-Cover-004-Cln.doc

3495-000

*Page 89*

**EXHIBIT 1**

**Page 89**

Schedule 2.1(l)

All of Seller's telephone, cell phone, and facsimile numbers, e-mail listings and
addresses, web sites, post office boxes, and all listings in all telephone books, directories,
and web sites

No telephone, cell phone, and facsimile numbers, e-mail listings and addresses, post
office boxes, or listings in telephone books and/o directories are being sold or conveyed
to the Seller.  Only Seller's website, "www. TrueCeramicPro.com". is being transferred
to the Seller under the Asset Purchase Agreement.

*EXHIBIT A*

# EXHIBIT 1
# Page 90

**Schedule 2.2(a)**

Excluded Assets - all cash or cash equivalents on hand or held by Seller in bank,
brokerage, or other accounts.

Excluded Assets includes any and all cash or cash equivalents on hand or held by Seller
in any and all banks, brokerages, or other accounts and any and all deposits with public
utilities, telephone companies, landlords, taxing agencies and others, including but not
limited to those listed in Seller's Bankruptcy Schedules.

*EXHIBIT A*

G:\Wp\Cases\A-B\Advanced-Beauty\Curran\APA-Schedules-Exhibits-Schedules-Cover-004-Cln.doc
3495-000

**EXHIBIT 1**
**Page 91**

**Schedule 2.2(b)**

Excluded Assets - all marketable securities

Excluded Assets includes any and all marketable securities in which Seller has an
interest, if any.

*EXHIBIT A*

G:\Wp\Cases\A-B\Advanced-Beauty\Cirtran\APA-Schedules-Exhibits-Schedules-Cover-004-Cln.doc
3495-000

*Page 92*

**EXHIBIT 1**
**Page 92**

Schedule 2.2(c)

Excluded Assets - all executory contracts and unexpired leases that are not Assumed
Contracts

*EXHIBIT A*

| Other Parties to the Rejected Contract | Description Of Rejected Contract |
|---|---|
| Tristar Products Inc<br>Attn President or CFO<br>492 Route 46 East<br>Fairfield, NJ 07004 | License Agreement |
| CirTran Corporation<br>Attn Ichab J Hawatmeh President<br>4125 So 6000 West<br>West Valley City, UT  84128 | Exclusive Manufacturing Agreement<br><br>CirTran provides contact manufacturing of the TrueCeramicPro which the Debtor markets and sells exclusively through television, the Internet and mail order channels. |
| Media Funding Corporation<br>Attn Peter Bieler President<br>29201 Heathercliff Road<br>Malibu, CA 90265 | Media Funding and Servicing Agreement<br><br>provides funding for media purchases to allow the broadcast of the Debtor's infomercial for the True Ceramic Pro |
| Media Funding Corporation<br>Attn Peter Bieler President<br>29201 Heathercliff Road<br>Malibu, CA 90265<br><br>CirTran Corporation<br>Attn Ichab J Hawatmeh<br>4125 So 6000 West<br>West Valley City, UT  84128<br><br>Datapak Services Corporation<br>Attn President or CFO or<br>Robert Lahiff General Counsel<br>55353 Lyon Industrial Drive<br>New Hudson, MI  48165<br><br>Inpulse Response Group Inc<br>Attn Steve Pittendrigh CEO<br>501 N 44th St Suite 300<br>Phoenix, AZ 85008 | Performance Agreement  and supplements/amendments<br><br>Debtor manufactures a beauty supply product known as the "TrueCeramicPro" infrared ceramic hair styler which the Debtor markets and sells exclusively through television, the Internet and mail order channels.  CirTran provides contact manufacturing of the TrueCeramicPro; Inpulse Response Group, Inc., provides inbound and outbound telemarketing services; Datapak Services Corporation provides warehousing, fulfillment and customer services and Media Funding Corporation provides funding for media services under the terms of its Media Funding and Servicing Agreement with Debtor as amended. |
| Inventory Capital Group Inc<br>Attn Todd Kesselman CEO<br>12424 Wilshire Blvd<br>Suite 1430<br>Los Angeles, CA 90025 | Master Procurement Agreement<br><br>Inventory Capital Group, Inc., procures product for the Debtor which it resells to the Debtor |

*EXHIBIT A*
G:\Wp\Cases\A-B\Advanced-Beauty\Cirtran\APA-Schedules-Exhibits-Schedules-Cover-004-Cln.doc
3495-000

*Page 94*

**EXHIBIT 1**
**Page 94**

| Other Parties to the Rejected Contract | Description Of Rejected Contract |
|---|---|
| Datapak Services Corporation<br>Attn President or CFO or<br>Robert Lahiff General Counsel<br>55353 Lyon Industrial Drive<br>New Hudson, MI 48165<br><br>Media Funding Corporation<br>Attn Peter Bieler President<br>29201 Heathercliff Road<br>Malibu, CA 90265 | Order Fulfillment and Administrative Services Agreement; Instructions to Fulfillment Company and supplements/amendments<br><br>Datapak Services Corporation provides warehousing, fulfillment and customer services relating to the sale of the TrueCeramicPro. |
| Euro RSCG DRTV<br>Attn President or CFO<br>1808 Aston Avenue #150<br>Carlsbad, CA 92008<br><br>Media Funding Corporation<br>Attn Peter Bieler President<br>29201 Heathercliff Road<br>Malibu, CA 90265 | Media Funding Accommodation Agreement<br><br>Media purchase relationship for the purchase of commercial broadcast and cable television time for the TrueCeramicPro infomercial. |
| TransFirst<br>Attn President or CFO<br>3 San Joaquin Plaza Suite 100<br>Newport Beach, CA 92660 | Credit card processing agreement |
| SKO Brenner American<br>40 Daniel Street<br>Farmingdale, NY 11735 | Contract for Collection Agent |
| Applied Perceptions LLC<br>Attn Robin Stone<br>PO Box 4379<br>Thousand Oaks, CA 91359 | Customer Service Contract |
| Script to Screen Inc<br>Attn President or CFO<br>200 N Tustin Avenue Ste #200<br>Santa Ana, CA 92705 USA | Informercial Production Contract |
| Pioneer Pacific List Marketing Inc<br>Attn Mike Scher President<br>14724 Ventura Blvd Suite 502<br>Sherman Oaks, CA 91403 | List Management Contract |
| Guy Merchant House<br>120 E Bay Street #E<br>Alhambra, CA 91801 | Manufacturing Contract |
| Seaside Marketing Inc<br>Attn President or CFO<br>9802 Ascot Drive<br>Omaha, NE 68114 | Retail Representative Contract |

### EXHIBIT A

# EXHIBIT 1
# Page 95

| Other Parties to the Rejected Contract | Description Of Rejected Contract |
|---|---|
| Advantage Media Services Inc<br>Attn President or CFO<br>29120 Commerce Center Drive #2<br>Valencia, CA 91355 | Fulfillment Contract |
| Bank of the West<br>16027 Ventura Blvd # 100<br>Encino, CA 91436 | Cash Management Contract |
| Interglobal International LTD<br>Attn President or CFO<br>St Thomas House Liston Road<br>Marlow<br>Bucks SL7 1DB UK | Distribution Agreement |
| Williams Worldwide Television (Worldwide Marketing Solutions Inc)<br>Attn President or CFO<br>3130 Wilshire Blvd Suite 300<br>Santa Monica, CA 90403 | Distribution Agreement |
| Northern Response<br>18 Skagway Ave<br>Toronto, Ontario<br>Canada M1M 3V1 | Distribution Agreement |
| Global Telesourcing LLC<br>Attn President or CFO<br>1029 North Royal Street Suite 200<br>Alexandria, VA 22314-1542<br><br>Global Telesourcing, LLC<br>12500 San Pedro Avenue, #430<br>San Antonio, TX 78216<br><br>Global Telesourcing, LLC<br>10881 NW 67th Place<br>Parkland, FL 33076 | Call Center and Telemarketing Agreement |
| Media Purchasing Acquisition LLC dba<br>ATC Agency Services<br>1230 American Blvd<br>West Chester, PA 19389 | Media Services Agreement |
| Authorize.Net Corp<br>915 South 500 East Suite 200<br>American Fork, UT 84003 | Request for Expanded Credit-Return Capabilities |
| Bank of American Fork<br>195 E 6100 South<br>Murray, UT 84107 | Deposit Control Agreements (CirTran Corporation)(Retail Cash Account, DRV Cash Account) |
| Livemercial Corporation<br>Attn President or CFO<br>3001 Leonard Drive<br>3rd Floor<br>Valparaiso, IN 46383 | Agreement for Professional Online Marketing Services |

*EXHIBIT A*

| Other Parties to the Rejected Contract | Description Of Rejected Contract |
|---|---|
| LiveOps Inc<br>Attn President or CFO<br>P O Box #49017<br>San Jose, CA  95161-9017 | Service Agreement (Live operator service) |
| Protocol<br>Attn Luiz Vasquez<br>PO Box #74586<br>Chicago, IL  60696 | Marketing Services Agreement<br>TrafficMarketplace Inc<br>15260 Ventura Blvd Suite 2000<br>Sherman Oaks, CA 91403 |
| Rackspace Managed Hosting<br>9725 Datapoint Drive Suite 100<br>San Antonio, TX 78229 | Service Order Form, Service Level Agreement Acceptable Use Policy and Master Services Agreement |
| Revenue Frontier LLC<br>Attn Shima Tousi<br>3340 Ocean Park Blvd #1005<br>Santa Monica, CA  90405 | Guarantee Orders Agreement |
| Seaside TCP Inc<br>9802 Ascot Drive<br>Omaha, NE 68114 | Exclusive Sales and Marketing Agreement |
| Tranvia Inc dba Tranvia Business Solutions<br>16-20 West 19th Street 10th Floor<br>New York, NY 10011 | Merchant Processing Agreement |
| TrafficMarketplace Inc<br>15260 Ventura Blvd Suite 2000<br>Sherman Oaks, CA 91403<br><br>TrafficMarketplace Inc<br>Attn President or CFO<br>2101 Rosecrans Blvd Suite 2000<br>El Segundo, CA 90245 | Ad Insertion Order and Contract |
| VANTAGEdr<br>Vantage Direct Response,LLC<br>Attn President or CFO<br>14205 SE 36th Street Ste 100<br>Bellevue, WA  98006 | Vantagedr End User Agreement |
| West Corporation<br>Thomas B. Barker is Chief Executive Officer<br>West Telemarketing, LP<br>Mark V. Lavin, President<br>11808 Miracle Hills Drive<br>Omaha, NE 68154 | telecommunications agreement |

*EXHIBIT A*

# EXHIBIT 1
# Page 97

| Other Parties to the Rejected Contract | Description Of Rejected Contract |
|---|---|
| QTVC Holdings LLC<br>Agent for Service Corporation<br>Service Company<br>2711 Centerville Road Suite 400<br>Wilmington, DE 19808<br><br>QTVC Holdings LLC<br>Attn Kirkwood Drew<br>2934 Beverly Glen Circle Suite 330<br>Los Angeles, CA 90077 | Letter Understanding dated February 1, 2005 |
| Listen Up Contact Solutions LLC<br>Attn Managing Member<br>40 Manson Libby Rd.<br>Scarborough, ME 04074 | Letter agreement dated August 25, 2005 for call center services |
| Any and all contracts listed on the Sale Approval Order as not to be assumed under the sale transaction | |

*EXHIBIT A*

**EXHIBIT 1**
**Page 98**

**Schedule 2.2(d)**

Excluded Assets - accounts and monetary obligations receivable and original records
representing such accounts and monetary obligations receivable of Seller, including, but
not limited to, invoices, ledgers, and proofs of delivery

None – Excluded Assets includes any and all accounts and monetary obligations
receivable and original records representing such accounts and monetary obligations
receivable of Seller, including, but not limited to, invoices, ledgers, and proofs of
delivery.

*EXHIBIT A*

### Schedule 2.2(e)

Excluded Assets - credit card reserves of Seller

Excluded Assets includes any and all credit card reserves of Seller including, but not limited to, those held by TransFirst ePayment Services, Inc., 12120 Shamrock Plaza Suite 100, Omaha, NE 68154

*EXHIBIT A*

# EXHIBIT 1
# Page 100

### Schedule 2.3

Assumed Liabilities. (Liabilities to be assumed by the Purchaser effective as of the
Closing Date - Purchaser hereby assumes and agrees to pay, discharge or perform, as
appropriate, (i) the obligations of Seller under the Assumed Contracts that accrue after
the Closing Date and (ii) the cure payments in connection with the executory contracts
and/or unexpired leases in the respective amounts set forth on Schedule 2.3 collectively,
the "Assumed Liabilities")

None.

*EXHIBIT A*

G:\Wp\Cases\A-B\Advanced-Beauty\Cirtran\APA-Schedules-Exhibits-Schedules-Cover-004-Cln.doc
3495-000

*Page 101*

# EXHIBIT 1
# Page 101

Schedule 2.4(c)

Allocation of the Purchase Price

Purchaser and Seller shall allocate the Purchase Price in accordance with Section 1060 of
the Internal Revenue Code and any related Regulations thereunder.

*EXHIBIT A*

G:\Wp\Cases\A-B\Advanced-Beauty\Cirtran\APA-Schedules-Exhibits-Schedules-Cover-004-Cln.doc
3495-000

*Page 102*

**EXHIBIT 1**
**Page 102**

**Schedule 3.1(a)**

Defective Units

*EXHIBIT A*

G:\Wp\Cases-A-B\Advanced-Beauty\Curran\APA-Schedules-Exhibits-Schedules-Cover-004-Cln.doc
3495-000

*Page 103*

**EXHIBIT 1**
**Page 103**

Defective Units

| INVENTORY PURCHASE | | | | |
|---|---|---|---|---|
| | Sku | Cost | Count | Value |
| IRONS | Iron | $16.95 | 6,200 | $105,090 |
| | | | 6,200 | $105,090 |

*EXHIBIT A*

G:\Wp\Cases\A-B\Advanced-Beauty\Cirtran\APA-Schedules-Exhibits-Schedules-Cover-004-Cln.doc
3495-000

*Page 104*

**EXHIBIT 1**
**Page 104**

**Schedule 4.4 of the Disclosure Schedule**

List of all Real Property leased by Seller

None.  As of the commencement of the Seller's Bankruptcy Case, the Seller was not a party to any real property leases.

*EXHIBIT A*

G:\Wp\Cases\A-B\Advanced-Beauty\Cintran\APA-Schedules-Exhibits-Schedules-Cover-004-Cin.doc
3495-000

*Page 105*

**EXHIBIT 1**
**Page 105**

**Schedules 4.5(a), 4.5(a)(i), 4.5(a)(ii), 4.5(a)(iii) of the Disclosure Schedule**

Except as disclosed in Schedule 4.5(a) of the Disclosure Schedule, Seller is the exclusive owner of all right, title and interest in and to all of the intellectual property in which Seller has an ownership interest or that has been used in the Business of Seller, and/or has been or is being developed or acquired for potential use in the Business of Seller and/or that has been promoted, sold, licensed or otherwise distributed by Seller to any third parties as follows:

Schedules 4.5(a)(i) of the Disclosure Schedule: Copyrights and registrations, if any, related to "True Ceramic Pro" and "HeatPlay"" and the following:

| Registration Number | Description |
|---|---|
| TX-6-064-955 | Advanced Beauty Solutions LLC website or web page: "www. TrueCeramicPro.com" |
| TX-6-064-956 | Advanced Beauty Solutions LLC brochure and literature |
| Not Applicable | True Ceramic Pro - Live Ops (TCP5) informercial and master tapes relating to the same |

Schedules 4.5(a)(ii) of the Disclosure Schedule: Patents and applications, if any, related to "True Ceramic Pro" and "HeatPlay"

Schedules 4.5(a)(iii) of the Disclosure Schedule: "True Ceramic Pro" trademark filing, Serial Number 78399698, which was filed with the U.S. Patent and Trademark Office on October 13, 2004, and the International Registration Number 0861761, with an International Registration Date of October 13, 2004.

**SELLER HAS NO OTHER INTELLECTUAL PROPERTY OR SELLER INTELLECTUAL PROPERTY RIGHTS.**

### Schedule 4.5 (b) of the Disclosure Schedule

All license and similar agreements between Seller and third parties, under which Seller is granted rights to the use, reproduction, distribution, manufacture, sale or licensing of items embodying the patent, copyright, Trade Secret, trademark or other proprietary rights of such third parties (collectively, the "Seller License Rights").

None.

Seller's agreements and contracts related to Seller's License Rights, if any, are listed in its Bankruptcy Schedules.  None of the Seller's agreements and contracts related to Seller's License Rights, if any, are being assigned to the Purchaser.

*EXHIBIT A*

G:\Wp\Cases\A-B\Advanced-Beauty\Cyrtuan\APA-Schedules-Exhibits-Schedules-Cover-004-Cln doc

3405-000

*Page 107*

# EXHIBIT 1
# Page 107

**Schedule 4.5(c) of the Disclosure Schedule**

All agreements under which Seller has granted any rights of whatever nature to third
parties of, to or under Seller Rights. Except as set forth in Schedule 4.5(c), all such rights
granted shall be terminated as of the Closing Date. True, correct and complete copies of
all such agreements have been delivered to Purchaser

None.

Seller's agreements and contracts related to Seller's Rights, if any, are listed in its
Bankruptcy Schedules. None of the Seller's agreements and contracts related to Seller's
Rights, if any, are being assigned to the Purchaser.

*EXHIBIT A*

# EXHIBIT 1
# Page 108

**Schedule 4.6 of the Disclosure Schedule**

List of each contract and agreement to which Seller is a party.

A list of the Seller's agreements and contracts is included on the Sale Approval Order and none of the agreements and contracts are to be assumed by the Seller and assigned to the Purchaser.

*EXHIBIT A*

### Schedule 4.7 of the Disclosure Schedule

List of all insurance policies covering Seller or otherwise held by or on behalf of it, or
any aspect of its Assets or Business, indicating the type of coverage, name of insured, the
insurer, the amount of coverage, the deductibles, the premium, and the expiration date.

Hartford/ Burlington

$2,000,000 general aggregate

Face of Policy indicates it expires on August 23, 2006, however as the premium has only
been paid through February 242006, and the Seller has conducted no business after such
date, the Seller has viewed this policy as canceled.

There are no pending claims under the foregoing.

*EXHIBIT A*

G:\W\p\Cases\A-B\Advanced-Beauty-Cirtran\APA-Schedules-Exhibits-Schedules-Cover-004-Cln.doc
3495-000

# EXHIBIT 1
# Page 110

**Schedule 4.10**

Environmental Matters.  Except as set forth on Schedule 4.10, Seller is not subject to any material Environmental Liabilities.

None.

*EXHIBIT A*

G:\Wp\Cases\A-B\Advanced-Beauty\Curran\APA-Schedules-Exhibits-Schedules-Cover-004-C\n.doc
3495-000

*Page 111*

**EXHIBIT 1**
**Page 111**

**Schedule 7.1(c)**

All Consents required in connection with the consummation of the transactions contemplated by this Agreement and the Closing (including those set forth on Schedule 7.1(c) hereto) shall have been duly obtained, made or given and shall be in full force and effect, without the imposition upon Purchaser or Seller of any condition, restriction or required undertaking

None.

*EXHIBIT A*

# EXHIBIT 1
# Page 112

### Schedule 7.1(h)

Additional Documents, etc. There shall have been delivered to Purchaser each of the
agreements, documents, certificates and other items set forth on Schedule 7.1(h) of this
Agreement

None.

*EXHIBIT A*

G:\Wp\Cases\A-B\Advanced-Beauty\Cirrant\APA-Schedules-Exhibits-Schedules-Cover-004-Cla.doc
3495-000

*Page 113*

**EXHIBIT 1**
**Page 113**

# EXHIBIT "B"

CirTran Corporation
ABS Royalty Payment Schedule
2006

First Payment - June '06 Sales (paid July 31, 06)
Royalty Payment              $    3.00
Minimum guaranteed royalty pymt. of $435,000 due w/in 2 years. i.e. June 30, 08
Maximum Royalty pymt. of $4,135,000
Post min Royalty:    $    1.70
Outstanding amount owed based on Units sold:        $ 22,368.60    (Reference Cumulative Total Column)
# of Units Sold - per TCP Sale / Invoice Excel report
# of Units Paid - per TCP Cash Receipts report

| Sales / CR Month | # of Units Invoiced | # of Units Paid | Amount Due | Amount Paid | Cumulative Total | Pymt. Due Date | Pymt. Date | Balance Due |
|---|---|---|---|---|---|---|---|---|
| Prior | 118 | | | | | | | |
| | | | | | | | | 435,000.00 |
| Jun 06 | 67 | 31 | 93.00 | 93.00 | 0.00 | 7/31/06 | 7/31/2006 | 434,907.00 |
| Jul 06 | 1800 | 1954 | 5862.00 | 5862.00 | 0.00 | 8/31/06 | 8/30/2006 | 429,045.00 |
| Aug 06 | 9724 | 4012 | 12036.00 | 12036.00 | 0.00 | 9/30/06 | 1/23/2007 | 417,009.00 |
| Sept 06 | 5212 | 8424 | 25272.00 | 25272.00 | 0.00 | 10/31/06 | 1/30/2007 | 391,737.00 |
| Oct 06 | 10404 | 5320 | 15960.00 | | 15960.00 | 11/30/06 | | 375,777.00 |
| Nov 06 | 10336 | 13212 | 39636.00 | | 55596.00 | 12/31/06 | | 336,141.00 |
| Dec 06 | 10804 | 3504 | 10512.00 | | 66108.00 | 1/31/07 | | 325,629.00 |
| Jan 07 | 10004 | 12604 | 37812.00 | | 103920.00 | 2/28/07 | | 287,817.00 |
| Feb 07 | 0 | 9404 | 28212.00 | | 132132.00 | 3/31/07 | | 259,605.00 |
| Mar 07 | 4056 | 4056 | 12168.00 | 37500.00 | 106800.00 | 4/30/07 | SCHEDULE | 247,437.00 |
| Apr 07 | 3730 | 3730 | 11190.00 | 62168.00 | 55822.00 | 5/31/07 | SCHEDULE | 236,247.00 |
| May 07 | 564 | 564 | 1692.00 | 57514 | 0.00 | 6/30/07 | SCHEDULE | 234,555.00 |
| Jun 07 | 2734 | 2375 | 7125.00 | 7125.00 | 0.00 | 7/31/07 | 7/30/2007 | 227,430.00 |
| Jul 07 | 1051 | 868 | 2604.00 | 2604.00 | 0.00 | 8/31/07 | 8/30/2007 | 224,826.00 |
| Aug 07 | 7319 | 4244 | 12732.00 | 12732.00 | 0.00 | 9/30/07 | 9/30/2007 | 212,094.00 |
| Sept 07 | 5336 | 5730 | 17190.00 | 17190.00 | 0.00 | 10/31/07 | 11/1/2007 | 194,904.00 |
| Oct 07 | 14521 | 14539 | 43617.00 | | 43617.00 | 11/30/07 | | 151,287.00 |
| Nov 07 | 20382 | 20183 | 60549.00 | | 104166.00 | 12/31/07 | | 90,738.00 |
| Dec 07 | 9751 | 9818 | 29454.00 | | 133620.00 | 1/31/08 | | 61,284.00 |
| Jan 08 | 4197 | 3963 | 11889.00 | 30000.00 | 115509.00 | 2/29/08 | | 49,395.00 |
| Feb 08 | 409 | 189 | 567.00 | 45000.00 | 71076.00 | 3/31/08 | | 48,828.00 |
| Mar 08 | 6787 | 6562 | 19686.00 | | 90762.00 | 4/30/08 | | 29,142.00 |
| Apr 08 | 6693 | 6022 | 18066.00 | | 108828.00 | 5/31/08 | | 11,076.00 |
| May 08 | 100 | 93 | 279.00 | | 109107.00 | 6/30/08 | | 10,797.00 |
| Jun 08 | 3599 | 3599 | 10797.00 | | 119904.00 | 7/31/08 | | - |
| **Post Min. Royalty at $1.70 per unit** | | | | | | | | |
| Jul 08 | 4184 | 4053 | 6890.10 | | 6890.10 | 8/31/08 | | |
| Aug 08 | 1814 | 1761 | 2993.70 | | 9883.80 | 9/30/08 | | |
| Sept 08 | 1806 | 1778 | 3022.60 | | 12906.40 | 10/31/08 | | |
| Oct 08 | 2847 | 2845 | 4836.50 | | 17742.90 | 11/30/08 | | |
| Nov 08 | 2711 | 2704 | 4596.80 | | 22339.70 | 12/31/08 | | |
| Dec 08 | 23 | 17 | 28.90 | | 22368.60 | 1/31/09 | | |
| | **162965** | **158158** | | | 142272.60 | | | |

EXHIBIT  B

| In re:<br>ADVANCED BEAUTY SOLUTIONS, LLC, Debtor<br>(Advanced Beauty Solutions v. CirTran Corporation) | Case No. 1:06-10076-GM<br>Chapter 11<br>Adv. No. 1:08-ap-01363-GM |
|---|---|

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 10250 Constellation Boulevard, Suite 1700, Los Angeles, California 90067

A true and correct copy of the foregoing document described as NOTICE OF MOTION AND MOTION TO SET ASIDE DEFAULT JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF IEHAB J. HAWATMEH IN SUPPORT THEREOF will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner indicated below:

I.  **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On July 20, 2009, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

- James C Bastian    jbastian@shbllp.com
- Lynda T Bui    lbui@shbllp.com
- United States Trustee (SV)    ustpregion16.wh.ecf@usdoj.gov

II.  **SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served): On July __, 2009, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. *Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.*

III.  **SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on July __, 2009, I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. *Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.*
Courtesy Copy Delivered via Attorney Service
Hon. Geraldine Mund
U.S. Bankruptcy Court
Courtroom 303
21041 Burbank Boulevard
Woodland Hills, CA 91367

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| July 20, 2009 | John Berwick | |
|---|---|---|
| *Date* | *Type Name* | *Signature* |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*                                                        **F 9013-3.1**